225 N.J. Super. 282 (1988)
542 A.2d 59
GREGORY F. FARRELL & SUSAN G. FARRELL, HIS WIFE, PLAINTIFFS/THIRD PARTY PLAINTIFFS,
v.
JOSEPH J. JANIK & CAROLYN L. JANIK, HIS WIFE, DEFENDANTS,
v.
WEICHERT REALTORS, INC., THIRD PARTY DEFENDANT.
Superior Court of New Jersey, Law Division Somerset County.
Decided March 28, 1988.
*285 Vincent T. Bisogno for plaintiff (Bisogno & Loeffler, attorneys).
Francis A. Bock for defendants (Orr & Bock, attorneys).
Martin A. Newmark for third-party defendant (Broderick, Newmark, Grather & Aspero, attorneys).
IMBRIANI, J.S.C.
This case involves a contract for the sale of a residence in which there arose claims of breach of contract against the buyers and negligence against the realtor. The contract was for $415,000 and was:
contingent upon obtaining, by or for the purchaser, a firm written commitment for a conventional mortgage in the amount of $185,000 ... If the mortgage commitment is not obtained by October 2, 1986, this contract shall be null and void.
The mortgage contingency date was later postponed to October 20, 1986. At the suggestion of the realtor, the buyers submitted a mortgage-loan application to an unfamiliar, out-of-county bank whose representative visited the buyers at their home on August 16, 1986 to complete an application. At that time the buyers were informed that they did not qualify for a $185,000 loan, but could probably qualify for a $162,000 loan, which they submitted. But, no one ever informed the sellers or realtor that the application was for less than that required by the contract.
Prior to September 30, 1986 there was little contract activity and no one suspected any problems. As a result, when the loan-commitment letter was received on September 30, 1986, the sellers and realtors were stunned, not only because the loan approval was for only $162,000, but because a condition of the loan was that:

*286 prior to or simultaneously with the acquisition of the subject property [the buyers must obtain] a fully executed sales contract [for their home] ... in the minimum amount of $275,000.
Why the bank required a $275,000 contract is unclear. But it is clear that the buyers had to sell their own home to obtain sufficient funds to purchase the seller's home. The realtor had appraised the buyers home for $260,000 to $265,000, but accepted a listing for $279,500 as demanded by the buyers. (Although there is some question of whether the same realtor should accept listings from both seller and buyer the court will not address that problem at this time.) When the bank's representative reviewed the listing agreement on August 16, 1986, she concluded from the listing agreement that the buyers home was actually worth $279,500 and inserted that value in the application. It is reasonable to assume that when the bank's loan committee reviewed the application they concluded that the buyers could complete the purchase without secondary financing only if they sold their home for at least $275,000, which presumably appeared to the loan committee to be reasonably attainable. No one from the bank appeared at the trial to offer an explanation.
When the realtor saw the $275,000 home-sale condition, it immediately realized this was unattainable and concluded that it effectively nullified the contract. The sellers obviously came to the same conclusion because they promptly relisted their home for sale. The buyers never submitted a loan application to another bank, but all parties agreed that given the existing market conditions it was unrealistic to expect a response from another bank prior to October 20, 1986.
The buyers sought the refund of their $25,000 deposit on the ground that they did not receive a "firm written commitment," and the sellers charged the buyers with breach of contract for refusing to close title. The sellers argue that the contract simply required the buyers to obtain a mortgage loan and since they "got one" they could not rescind the contract. The sellers *287 apparently believe that the loan condition for the sale of the buyers' home for $275,000 is irrelevant.
A mortgage contingency clause informs the sellers in clear and unmistakable language that the buyers do not possess sufficient funds to consummate the purchase without a loan. This contract required a "firm written commitment" and the buyers emphasize the word "firm"; however, the court believes it is redundant. It was or should have been clear to the sellers that what the buyers wanted and needed was a loan that was subject to no conditions or only conditions that were within their sole control. The touchstone in construing a contract is to ascertain the intention of the parties and "if the four corners of the deed or contract provide a coherent expression of the parties intent, we need search no further." Oldfield v. Stoece Homes, Inc., 26 N.J. 246, 257 (1958). It is inconceivable that any seller could believe that a buyer would agree to be bound by a contract if the loan commitment contained conditions beyond their sole ability to satisfy.
A mortgage-loan-contingency clause certainly requires the buyers to use their best efforts to comply with any and all conditions imposed by the lending institution as a pre-condition for obtaining the loan. Thus, if a condition of the loan is obtaining employment verification, the buyer must execute and submit an authorization to secure the necessary documents from his employer. Or, if a condition is the issuance of a satisfactory termite inspection report, the buyer must order and pay for such an inspection. But a condition that the buyers sell their home at a minimum price is not within the buyers sole control but is subject to the vagaries of market conditions and can be satisfied only if another person offers to purchase at the minimum price.
It is undisputed that when the bank interviewed the buyers and accepted their application there was not the slightest hint that a condition of the loan would be the obtaining of a contract for the sale of their home, much less that it would have to be *288 for the price of $275,000 or more. The buyers were as shocked as the sellers and the realtor at this condition, which everyone concedes was rather unusual in the past, but lately has become more common. This recent trend is resulting in more and more contracts containing language that the buyers must obtain a "firm" or "unconditional" mortgage commitment or similar language. However, the court perceives no real distinction among them. An acceptable loan is one which is solely within the power of the borrower to obtain and the use of such words as "firm" or "unconditional" add nothing.
The court is satisfied that the buyers did not secure the necessary mortgage loan by October 20, 1986 and by the express terms of the contract it became null and void. Accordingly, judgment is entered in favor of the buyers and against the sellers for the return of the deposit of $25,000, plus any interest earned thereon while the funds were held in escrow.
The claim of the sellers against the realtor is more troublesome. A realtor is a fiduciary of the seller, Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 553 (1967), and its duties do not cease upon the execution of a contract. A realtor must thereafter continue to exert its best efforts to assist the sellers in closing title and receiving the sale proceeds. This is not to suggest that the realtor must guarantee that the contract will be consummated. However, a realtor does have an obligation to periodically review the status of the contract, check to see if the buyers are attending to their obligations under the contract, and, at least when the realtor has introduced the buyers to the mortgagee, periodically communicate with the bank to ascertain if the application is proceeding smoothly. If there is a causal connection between the realtor's failure to oversee the transaction and the loss sustained by the sellers, the realtor may be held liable. Sullivan v. Jefferson, Jefferson & Vaida, 167 N.J. Super. 282 (App.Div. 1979).
A realtor does not hold itself out to the public merely as a salesperson, but rather as a salesperson skilled in real estate *289 transactions. The distinction is significant. The sellers were not selling a $400 television set, or a $2,000 bedroom set, but their major asset  a home having a market value of over $400,000. No one entrusts such a valuable asset to any salesperson. The sellers sought and were entitled to an expert in real estate sales.
Since the realtor held itself out as a specialist in the sale of real estate it was required to employ not merely the skill of a salesperson, but that special degree of skill normally possessed by the average realtor licensed in New Jersey who has devoted special study and experience in the field of real estate sales. Ordinarily, what constitutes the standard of care to be employed by an expert and whether there was a deviation from that standard can be established only from the testimony of similar experts who testify in court. Butler v. Acme Markets, Inc. 89 N.J. 270, 283 (1982). But this is not always required. For instance, expert testimony is not required to establish a standard of care as to what are adequate measures for a supermarket to protect its customers from criminal activity, Butler v. Acme Markets Inc. supra; to resolve a custody dispute, Wist v. Wist, 101 N.J. 509 (1986); or to prove that a defective mechanism in an automobile was the cause for the engine to hesitate and stall, Ventura v. Ford Motor Corp., 180 N.J. Super. 45 (App.Div. 1981).
In other words, when the issue of responsibility is one that as a matter of common knowledge is within the ken of a layperson, expert testimony is not required to establish the required standard of care. If the conduct of an expert is so obviously wanting in skill and care we depart from the normal rule requiring that the standard of care and deviation be established by expert testimony. Ronrick v. City of Newark, 74 N.J. Super. 200 (App.Div. 1962); Terhune v. Margaret Hague Maternity Hospital, 63 N.J. Super. 106 (App.Div. 1960). As said in Lentino v. Fringe EMP Plans, Inc. 611 F.2d 474 (3 Cir.1979) expert testimony is not necessary:

*290 where the matter under investigation is so simple and the lack of skill so obvious, as to be within the experience and comprehension of non-professional persons. [At 480.]
In this case there was no expert testimony of what constituted the standard of care to be employed by a realtor in a case such as this, but we are satisfied that it was not necessary because the conduct of the realtor was so wanting in care and skill in two respects as to be apparent to a layperson.
First, was the failure of the realtor to carefully monitor the progress of the mortgage-loan application. When, as here, the realtor introduced the buyer to an unfamiliar lending institution it was obligated to monitor the progress of the loan. This is not the situation when the buyers select the bank to which they submit a loan application. The buyers cannot be expected to attend to monitoring the processing of the loan at an unfamiliar bank, especially when the bank is located some distance away. As a fiduciary of the sellers, the realtor must be held accountable for this responsibility. It cannot abdicate its responsibilities to the sellers to actively supervise, to the extent possible, the processing of the loan to facilitate the closing of title.
If diligent, the realtor could have learned long before September 30, 1986, of the possible, if not probable, condition of the loan that the buyers would have to obtain a contract for the sale of their home for $275,000 or more. And if informed of this possibility at an earlier time the buyers could have applied to another bank in sufficient time perhaps to have obtained a loan from another bank prior to October 20, 1986 which did not contain this same condition. And if the sellers were informed of this possibility, who can say that they would not have conferred with the buyers and realtor and nullified the contract at an earlier date, thereby enabling them to relist their home at an earlier date? And who can say that if the realtor became aware of the possible condition that the buyers home would have to be sold for at least $275,000 that they could not have demonstrated to the bank that the financial condition of the *291 buyers was such that this condition could be reduced to a more realistic sale price?
There was absolutely no excuse for the realtor not knowing that the buyers had applied for a loan which was less than required by the contract. It is well to say that no harm befell the sellers because a mortgage-contingency clause is primarily for the benefit of the buyers who were "free to close with a smaller mortgage or no mortgage at all," Friedman v. Chopra, 220 N.J. Super. 546, 550 (App.Div. 1987), but how was the seller to know that the buyers applied for only a $162,900 loan? If the buyers showed the sellers a $162,000 commitment letter and asked for the contract to be rescinded, how would the sellers know that the reason for the lower commitment was the lower application? As has so often been said, negligence is not only the doing of an act that the reasonable and prudent realtor would not have done, but also the failure to do that what a reasonable and prudent realtor would have done under the same or similar circumstances.
Second, was the failure of the realtor to inform the bank that the buyers could close title without any secondary financing if they received as little as $260,000 from the sale of their home. The evidence suggests that such a contract was realistically attainable. Yet, for reasons which the realtor was unable to explain in court after receiving the commitment letter, this information was never conveyed to the bank. No effort was made by the realtor to ask the bank to amend the loan commitment to provide for the sale of the buyers' home for as little as $260,000. If the bank was told that no secondary financing was necessary if the buyer sold their home for as little as $260,000, it is inconceivable that the bank would not have amended their commitment so that this contract could have been saved. But, incredibly, no one asked the bank to do so.
Given the fiduciary relationship of the realtor to the sellers, especially where as here it was the realtor who introduced the buyers to an unfamiliar bank, the realtor had a duty to explore, *292 with the bank, methods by which the contract could be consummated. Certainly, a realtor cannot compel a bank to remove a loan condition which the bank believes is reasonable and necessary to secure its investment. But where it can be shown that a bank probably would have amended its loan commitment to enable the contract to be consummated, the failure of the realtor to convey pertinent information to the bank was a violation of their fiduciary duty to the sellers and constituted negligence.
For these reasons the court finds in favor of the sellers on their claim of negligence against the realtor.