625 A.2d 1110

EMILY S. HOPKINS, PLAINTIFF–RESPONDENT, v. FOX & LAZO REALTORS, JACK BURKE REAL ESTATE, INC., STEPHEN FIELDS AND PAT GUERRY, DEFENDANTS–APPELLANTS, AND JOHN GARVER, SUSAN GARVER, HIS WIFE; U.S. HOME CORPORATION, MORGAN M. DAVIS, DOUGLAS M. SONIER AND BARBARA A. SONIER, HIS WIFE, DEFEN-DANTS.

Argued January 20, 1993—Decided June 16, 1993.

*Charles Peter Hopkins, II,* argued the cause for appellants.

*John G. Devlin* argued the cause for respondent (*Devlin, Cittadino & Shaw,* attorneys).

*Marc D. Policastro* submitted a brief on behalf of *amicus curiae,* New Jersey Association of Realtors (*Greenbaum, Rowe, Smith, Ravin & Davis,* attorneys; *Arthur M. Greenbaum,* of counsel; *Mr. Policastro* and *Mr. Greenbaum,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

This appeal requires the Court to determine whether a real-estate broker who holds an "open house" for the purpose of attracting potential buyers has a duty of care with respect to their safety, including a duty to warn of dangerous conditions in the home. The case arose when such a visitor, a relative of prospective purchasers, fell down during an open-house tour sponsored by the broker. The fall occurred when she proceeded down from one level of the house to another and missed a step, which she claimed constituted a dangerous condition be-

cause the connecting step was camouflaged by the similar floor that covered both levels.

The basic question to be answered by this appeal implicates a broader issue: whether a broker's duty of care in these circumstances is to be determined by the traditional common-law doctrine that defines the duty of care imposed on owners and possessors of land or, instead, by more general principles that govern tort liability.

I

On April 26, 1987, plaintiff, Emily Hopkins, accompanied her son and daughter-in-law to an open house in Plainsboro, New Jersey. The party had been invited by a salesperson employed by defendant broker, Fox & Lazo Realtors. The threesome entered the house. Initially, they were not greeted by a realtor. Consequently, they started to tour the premises on their own.

On entering the kitchen, Mrs. Hopkins and her family were greeted by a broker's representative. The realtor left them free to inspect the house unaccompanied. The kitchen of the house led up to a family room that was slightly elevated from the front portion of the house. On the same level as the family room were a powder room and laundry room. Mrs. Hopkins waited on the upper level in the family room, while her family viewed the patio and grounds.

When Mrs. Hopkins heard her son and daughter-in-law re-enter, she attempted to join them in the foyer, where the staircase to the second floor was located. She proceeded down the hallway from the laundry room towards the foyer. She was unaware that a step led down from the hallway into the foyer. The floors on both levels and the step were covered with the same pattern vinyl. According to Mrs. Hopkins, the use of the same floor covering on both levels camouflaged the presence of a step. Not anticipating the presence of a step, she lost her footing and fell, fracturing her right ankle.

Mrs. Hopkins filed a complaint against defendant Fox & Lazo Realtors. She asserted that defendant broker had a legal duty to warn her of any known risks inside the house or any risks that a reasonable inspection of the house would have revealed. The trial court, although satisfied that plaintiff was not required to produce the testimony of an expert to establish negligence, determined that the broker did not have any duty with respect to dangerous conditions of the property, and dismissed plaintiff's complaint. On appeal, the Appellate Division concluded that the broker had such a duty of care, and it reversed the trial court's judgment. 252 *N.J.Super.* 295, 599 *A.*2d 924 (1991). We granted defendant's petition for certification, 127 *N.J.* 567, 606 *A.*2d 377 (1992).

## II

The traditional common law approach to landowner or occupier tort liability toward a person who has been injured because of a dangerous condition on private property is predicated on the status of the person on the property at the time of the injury. Historically, the duty of the owner or occupier to such a person is gauged by the right of that person to be on the land. That status is determined by which of three classifications applies to the entrant, namely, that of a business invitee, licensee, or trespasser. *E.g., Snyder v. I. Jay Realty,* 30 *N.J.* 303, 153 *A.*2d 1 (1959).

██ An owner or possessor of property owes a higher degree of care to the business invitee because that person has been invited on the premises for purposes of the owner that often are commercial or business related. A lesser degree of care is owed to a social guest or licensee, whose purposes for being on the land may be personal as well as for the owner's benefit. The owner owes a minimal degree of care to a trespasser, who has no privilege to be on the land. *See, e.g., Snyder, supra,* 30 *N.J.* at 303, 311, 153 *A.*2d 1; *Taneian v. Meghrigian,* 15 *N.J.* 267, 271, 104 *A.*2d 689 (1954); *Russell v.*

*Merck & Co.*, 211 *N.J.Super.*, 413, 417, 511 *A.*2d 1247 (App.Div. 1986); *Caroff v. Liberty Lumber Co.*, 146 *N.J.Super.* 353, 357–58, 369 *A.*2d 983 (App.Div.1977).

 The duty owed to a trespasser is relatively slight. A landowner, under most circumstances, has a duty to warn trespassers only of artificial conditions on the property that pose a risk of death or serious bodily harm to a trespasser. *Renz v. Penn Cent. Corp.*, 87 *N.J.* 437, 435 *A.*2d 540 (1981); *Restatement (Second) of Torts* § 337 (1969). To the social guest or licensee, the landowner owes a greater degree of care. Although the owner does not have a duty actually to discover latent defects when dealing with licensees, the owner must warn a social guest of any dangerous conditions of which the owner had actual knowledge and of which the guest is unaware. *Berger v. Shapiro*, 30 *N.J.* 89, 97–98, 152 *A.*2d 20 (1959); *Benedict v. Podwats*, 109 *N.J.Super.*, 402, 406–07, 263 *A.*2d 486 (App.Div.), *aff'd o.b.*, 57 *N.J.* 219, 271 *A.*2d 417 (1970); *Restatement (Second) of Torts* § 343 (1969); *Prosser and Keeton on the Law of Torts* § 60 (5th ed. 1984).

██ Only to the invitee or business guest does a landowner owe a duty of reasonable care to guard against any dangerous conditions on his or her property that the owner either knows about or should have discovered. That standard of care encompasses the duty to conduct a reasonable inspection to discover latent dangerous conditions. *Handleman v. Cox*, 39 *N.J.* 95, 111, 187 *A.*2d 708 (1963); *Restatement (Second) of Torts* § 343 (1969); *see Butler v. Acme Markets, Inc.*, 89 *N.J.* 270, 275, 445 *A.*2d 1141 (1982).

In this case, the parties have attempted to fit themselves into those traditional categories. Plaintiff contends that she was an invitee of defendant broker. The premises during an open-house tour, plaintiff asserts, temporarily becomes the "place of business" for the realtor, who has a duty as the "proprietor" of the premises to exercise reasonable care to see that its place of business is safe for its business invitees. Because a broker

invites potential customers onto residential property to advance the broker's economic interest, those persons are business invitees. Defendant contends that because a real-estate broker is not an actual owner or occupier of land but merely the agent of a homeowner, the broker has no duty when holding an open house to inspect the premises and to warn invitees of potentially-dangerous conditions on the premises.

The Appellate Division determined that a broker who holds an open house is functionally equivalent to an occupier of land. "It is evident that in taking possession of the house, the broker is in effect, using his principal's property as a place of business," and, further, that plaintiff in attending the open-house tour had the status of both an invitee and a licensee. 252 *N.J.Super.* at 301, 599 *A.*2d 924.

Initially, we are impelled to question whether we should resort to the common law doctrine of premises liability to determine if in these circumstances a real-estate broker owes a duty of care to prospective potential purchasers who are inspecting the owner's home on an open-house tour conducted by the broker. We have long acknowledged that the legal rules expressive of the common law embody underlying principles of public policy and perceptions of social values. Because public policy and social values evolve over time, so does the common law. "The power of growth is inherent in the common law." *State v. Culver*, 23 *N.J.* 495, 506, 129 *A.*2d 715 (1957). For that reason, the common law cannot be immutable or inflexible. "One of the great virtues of the common law is its dynamic nature that makes it adaptable to the requirements of society at the time of its application in court." *Id.* at 505, 129 *A.*2d 715.

The traditional common law doctrine governing premises liability is no exception. "[T]he historical classifications of the degrees of care owing to visitors upon land," we have observed, "are undergoing gradual change in the law in favor of a broadening application of a general tort obligation to exercise reasonable care against foreseeable harm to others." *Butler,*

*supra,* 89 *N.J.* at 277, 445 *A.*2d 1141; *Renz, supra,* 87 *N.J.* at 462, 435 *A.*2d 540; *see also Snyder, supra,* 30 *N.J.* at 311, 153 *A.*2d 1 (applying the traditional doctrine, Court nevertheless stated "these common law classifications are sufficiently flexible to fulfill the purposes of our legal system in serving the needs of present day society").

The evolution toward a more resilient approach to premises liability has been gradual but perceptible. The common law doctrine with its rigid classifications prescribing premises liability is rooted in early nineteenth century notions of private property interests. Adhering to social mores that placed a paramount value on pastoral and agrarian ideals, courts strove to maximize the protection of rights of landowners to use and enjoy their land. Marsh, *The History and Comparative Law of Invitees, Licensees and Trespassers,* 69 *L.Q.Rev.* 182, 184 (April 1953); 2 *Harper & James* § 27.2 at 1432; *Smith v. Arbaugh's Restaurant, Inc.,* 469 *F.*2d 97, 101 (D.C.Ct.1972), *cert. denied,* 412 *U.S.* 939, 93 *S.Ct.* 2774, 37 *L.Ed.*2d 399 (1973). As England and later the United States became increasingly industrialized, and the regime of capitalism promoted economic growth, property rights became less absolute. Morton Horwitz, *The Transformation of American Law* 31–62 (1977). Thus, with the development of a more urbanized, heterogeneous, destabilized, and complex society, the status of persons in relation to the use of property could no longer be adequately accommodated by the strict traditional classifications of the common law. "The trespasser who steps from a public sidewalk onto a private parking lot today is not the 'outlaw' or 'poacher' whose entry was both unanticipated and resented in the nineteenth century." *Smith, supra,* 469 *F.*2d at 102–03; *see Renz, supra,* 87 *N.J.* at 462, 435 *A.*2d 540.

California was the first jurisdiction to eliminate the common-law boundaries between premises-liability classifications in its landmark decision, *Rowland v. Christian,* 69 *Cal.*2d 108, 70 *Cal.Rptr.* 97, 443 *P.*2d 561 (1968), which observed that "to focus upon the status of an injured party as a trespasser,

licensee or invitee in order to determine the question of whether a landowner had a duty of care, is contrary to our modern social mores and humanitarian values." *Id.*, 443 *P.*2d at 565–68. Approximately fourteen jurisdictions have completely abrogated the various categories of entrants, and thus have also eliminated the hierarchical scheme defining a landowner's duty toward persons who came on to their land. *E.g., Smith, supra,* 469 *F.*2d 97; *Webb v. Sitka*, 561 *P.*2d 731 (Ak.1977); *Rowland, supra,* 443 *P.*2d 561; *Mile High Fence Co. v. Radovich*, 175 *Colo.* 537, 489 *P.*2d 308 (1971), *aff'g* 28 *Colo.App.* 400, 474 *P.*2d 796 (1970); *Pickard v. Honolulu*, 51 *Haw.* 134, 452 *P.*2d 445 (1969); *Keller v. Mols*, 129 *Ill.App.*3d 208, 84 *Ill.Dec.* 411, 472 *N.E.*2d 161 (1984); *Cates v. Beauregard Electric Cooperative, Inc.*, 328 *So.*2d 367 (La.1976), *certif. denied*, 429 *U.S.* 833, 97 *S.Ct.* 97, 50 *L.Ed.*2d 98 (1976); *Singleton v. Charlebois Constr. Co.*, 690 *S.W.*2d 845 (Mo.App.1985); *Limberhand v. Big Ditch Co.*, 218 *Mont.* 132, 706 *P.*2d 491 (1985); *Oullette v. Blanchard*, 116 *N.H.* 552, 364 *A.*2d 631 (1976); *Basso v. Miller*, 40 *N.Y.*2d 233, 386 *N.Y.S.*2d 564, 352 *N.E.*2d 868 (1976), *modifying* 47 *A.D.*2d 812, 366 *N.Y.S.*2d 1009; *Mariorenzi v. Joseph Di Ponte, Inc.*, 114 *R.I.* 294, 333 *A.*2d 127 (1975). Many other jurisdictions have eliminated the distinction between licensees and business invitees. *Wood v. Camp*, 284 *So.*2d 691 (Fla. 1973); *Hardin v. Harris*, 507 *S.W.*2d 172 (Ky.1974); *Poulin v. Colby College*, 402 *A.*2d 846 (Me.1979); *Mounsey v. Ellard*, 363 *Mass.* 693, 297 *N.E.*2d 43 (1973); *Peterson v. Balach*, 294 *Minn.* 161, 199 *N.W.*2d 639 (1972); *O'Leary v. Coenen*, 251 *N.W.*2d 746 (N.D.1977); *Hudson v. Gaitan*, 675 *S.W.*2d 699 (Tenn.1984); *Antoniewicz v. Reszcynski*, 70 *Wis.*2d 836, 236 *N.W.*2d 1 (1975). England, the birthplace of premises liability, also abolished the distinction between licensees and invitees with the passage of the Occupier's Liability Act of 1957. Towards both of these entrants, a landowner owes a "common duty of care".

Clearly, it is becoming increasingly difficult to define our modern circumstances by resort to the rigid constructs of the

early common law. In a case such as this in which the legal relationships are not precisely defined, the attempt to pigeonhole the parties within the traditional categories of the common law is both strained and awkward. Moreover, to analogize the status of the parties to the common law classifications holds no great comfort that the analysis will center on factors that will lead to a sound principle of tort liability. In determining premises liability "the common law rules obscure rather than illuminate the proper considerations which should govern determination of the question of duty." *Rowland, supra,* 443 *P.*2d at 568.

Resort to the common law methodology with its insistence on traditional classifications in this setting is not especially instructive and does not necessarily provide reliable guidance in determining the existence and scope of the duty of care that should be ascribed to a broker. The Appellate Division itself was unable easily to characterize or analogize the status of the parties in relation to the common law doctrine. It concluded that the broker's status was to be equated with that of the owner, but also found that plaintiff's status was that of both a business invitee and a social guest. 252 *N.J.Super.* at 301, 599 *A.*2d 924. The court then reasoned from those classifications that the broker's duty combined elements of the "duty of a social host and of the occupier-invitor." *Id.* at 302, 599 *A.*2d 924.

The inquiry should be not what common law classification or amalgam of classifications most closely characterizes the relationship of the parties, but, as exemplified by our decision in *Butler,· supra,* whether in light of the actual relationship between the parties under all of the surrounding circumstances the imposition on the broker of a general duty to exercise reasonable care in preventing foreseeable harm to its open-house customers is fair and just. That approach is itself rooted in the philosophy of the common law. *See Palsgraf v. Long Island R.R. Co.,* 248 *N.Y.* 339, 162 *N.E.* 99 (1928); *Heaven v. Pender,* 11 *Q.B.D.* 503, 509 (C.A.1883) (Brett, M.R.).

## III

Determining the scope of tort liability has traditionally been the responsibility of the courts. *Kelly v. Gwinnell*, 96 *N.J.* 538, 552, 476 *A.*2d 1219 (1984). The actual imposition of a duty of care and the formulation of standards defining such a duty derive from considerations of public policy and fairness. *Ibid.* "This Court has carefully refrained from treating questions of duty in a conclusory fashion, recognizing that '[w]hether a duty exists is ultimately a question of fairness.' " *Weinberg v. Dinger*, 106 *N.J.* 469, 485, 524 *A.*2d 366 (1987) (quoting *Goldberg v. Housing Auth.*, 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962)).

Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. *Goldberg, supra,* 38 *N.J.* at 583, 186 *A.*2d 291. That inquiry involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution. *Ibid.* The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct.

The inherent complexity of tort analysis is evident in this case. Although we recognize that many variations of circumstances exist under which a broker can assist a customer in viewing a private residence, we deal here with the role and responsibility of a broker in conducting an open-house inspection of a residence. Certain common aspects of the broker's trade in this context can be identified. As plaintiff notes, a real-estate broker, in many situations, manages or directs an open-house inspection of the premises. The broker is responsible in this context for advertising the open house, posting signs, and ultimately inviting customers onto the premises. A broker

frequently suggests conducting such an event to a homeowner. The owner is often absent from the premises for the duration of the open house. In this case, defendant not only posted signs announcing the open house but also extended a personal invitation to plaintiff and her family. One may reasonably assume in this context that a customer acts on the broker's invitation to come on to the property.

However, unlike buyers or sellers, open-house visitors are *potential* customers. The open-house visitor has not always established a firm business or fiduciary relationship with the broker. That is not to say, however, that an open-house visitor does not have a cognizable relationship with the broker. Thus, the broker is authorized to invite that person to come on the property and to offer myriad professional services. Those services would include the broker's expertise and knowledge concerning the marketability of the premises, which would in ordinary experience imply a familiarity with the actual physical features of the premises, as well as other factors affecting its market value. "A realtor does not hold itself out to the public as a salesperson, but rather as a salesperson skilled in real estate transactions. The difference is significant." *Farrell v. Janik*, 225 *N.J.Super.* 282, 288–89, 542 *A.*2d 59 (Law Div.1988). Correlatively, by responding to the broker's invitation the customer gains permission to come on to the property and participate in the open-house tour conducted by the broker. The customer may reasonably expect to be able to rely on and use the services proffered by the broker in connection with an examination of the premises.

The broker, of course, owes a professional duty to the owner and acts as the owner's agent in the sale of the home. *Ellsworth Dobbs v. Johnson*, 50 *N.J.* 528, 236 *A.*2d 843 (1967); *Melveney v. McCrane*, 138 *N.J.Super.* 456, 462, 351 *A.*2d 385 (App.Div.1979); *Rosenthal v. Art Metal, Inc.*, 95 *N.J.Super.* 8, 229 *A.*2d 676 (Law Div.1967). Nevertheless, the broker receives very tangible economic benefits from the relationship

with the potential buyers who visit the home. The open house enables the broker to sell the house and to earn a commission. Also, plaintiff points out, an open house presents a broker with an opportunity to meet and cultivate future clients. More generally, the broker can discuss other listings with visitors and thus promote his or her individual business interests. Thus, the economic benefit that a broker obtains from staging an open house extend beyond the potential sale of the particular property.

In sum, the nature of the relationship between a real-estate broker and its customer in the conduct of an open-house inspection of property is substantial. The relationship confers certain specific benefits on the broker and creates expectations on the part of the customer with respect to the broker's professional services. Based on the nature and circumstances surrounding an open house, we conclude that implicit in the broker's invitation to customers is some commensurate degree of responsibility for their safety while visiting the premises.

Defendant nonetheless resists the imposition of any duty of care on a real-estate broker with respect to dangerous conditions of the property. It contends that the risk attendant in holding an open house has already been rationally allocated to the homeowner, who is in the best position to inspect the premises and make necessary repairs.

We agree that a homeowner has a preexisting duty towards invitees, including prospective purchasers, to make reasonable inspections of the property and to remedy any reasonably discoverable defects. See *Butler, supra,* 89 *N.J.* at 225, 445 *A.*2d 1141. Further, our courts have consistently held that an owner or occupier's duties are non-delegable. *Sanna v. National Sponge Co.,* 209 *N.J.Super.* 60, 506 *A.*2d 1258 (App. Div.1986) (holding that duty of landowner to make reasonable inspections to discover hazardous conditions of property nondelegable); *Piro v. Public Serv. Elec. & Gas Co.,* 103 *N.J.Super.* 456, 247 *A.*2d 678 (App.Div.) (holding that defendant utility

company could not relinquish duty to provide safe workplace by transferring duty to independent contractor), *aff'd*, 53 *N.J.* 7, 247 *A.*2d 667 (1968). Nevertheless, although an open-house visitor becomes an invitee of a homeowner through the broker as the owner's agent, the visitor, as found by the Appellate Division, is the invitee of the broker as well because the broker's own economic interests are served by the invitation. 252 *N.J.Super.* at 301–02, 599 *A.*2d 924. Hence, based on the dual invitation a somewhat shared responsibility emerges on the part of the owner and the broker for the well-being of a potential purchaser to the extent that they share the benefits derived from that person's presence on the property.

 The homeowner's preexisting duty does not abrogate or supersede a broker's responsibility toward its customers. Although those respective duties may not be coextensive, they are concomitant. Our courts have often recognized that more than one party can possess similar duties or responsibilities toward a third party. *See, e.g., Klinsky v. Hanson Van Winkle Munning Co.*, 38 *N.J.Super.* 439, 119 *A.*2d 166 (App.Div.1955), *certif. denied*, 20 *N.J.* 534, 120 *A.*2d 661 (1956) (holding that company athletic association and amusement park both had duty to protect employees during softball game held at amusement park).

The mere invitation that triggers a duty of care owed by a broker to an open-house visitor does not serve adequately to define the scope of that duty. In determining the scope or nature of a broker's duty in those circumstances, one must analyze more completely the extent of the invitation, the risk involved in the activity, and the fairness of imposing a duty to avoid that risk. *Goldberg, supra*, 38 *N.J.* at 583, 186 *A.*2d 291. The relevant inquiry may be framed in terms of what risk to others a reasonably prudent real-estate broker undertaking the responsibilities and performing the functions of conducting an open-house inspection would foresee and what such a broker would do under those circumstances to forestall that risk. *See*

*People Express Airlines v. Consolidated Rail*, 100 *N.J.* 246, 262, 495 *A.*2d 107 (1985).

It is highly foreseeable that visitors to an open house could be injured by dangerous conditions during the course of wandering through an unfamiliar house. *See Jarr v. Seeco Constr.*, 35 *Wash.App.* 324, 666 *P.*2d 392, 396 (1983) (holding that jury could find it foreseeable that a prospective purchaser could be injured while walking through active construction site with broker). However, identifying a given risk does not itself address the actual burden that would be placed on a party in preventing such a risk and whether that burden should be imposed. We note that what precautions are reasonable depends in part on the practicability of preventing the harm. *Weinberg, supra*, 106 *N.J.* at 469, 524 *A.*2d 366. In instances such as this, courts will be required to draw on notions of fairness, common sense, and morality in order to fix the limits of liability as a matter of public policy. *Kelly, supra*, 96 *N.J.* at 538, 476 *A.*2d 1219.

In the past, our courts have found it possible to speak of the duty of care of a reasonable realtor as "one who possess that special degree of skill normally possessed by the average realtor licensed in New Jersey who has devoted special study and experience in the field of real estate sales." *Farrell, supra*, 225 *N.J.Super.* at 289, 542 *A.*2d 59. The Appellate Division here concluded that defendant had a duty to conduct a reasonable inspection of the premises and to either warn customers of (through the placement of signs) or subsequently repair any physical defects that were "reasonably discoverable." 252 *N.J.Super.* at 302, 599 *A.*2d 924. It is, however, not at all clear that such a seemingly expansive, and consequently ambiguous, duty of care is implicit in the relationship between the broker and the open-house visitor. We therefore cannot agree that the imposition of such a broad duty of care comports with notions of fairness and sound public policy.

In this case, the key to the broker-customer relationship, which gives rise to a duty of care, is the services that are offered by the broker and expected by the customer in the context of an open-house inspection of property. That duty of care should be commensurate with that relationship. In many cases, the customer may reasonably expect that the broker will be familiar with the premises and would rely on the broker's presumed familiarity with the house, including a knowledge of all of its important features and physical characteristics. Such factors would ordinarily include matters relating to home safety such as fire or burglar alarms, locks, and the like, and, contrastingly, defects like broken steps, exposed electrical wiring, and missing or weak railings.

Nevertheless, we are informed, not all brokers are actually familiar with the all of the houses that they may show to potential buyers. Some brokers will not have had the opportunity to inspect the house before the open house commences. Further, unanswered by this record is whether a reasonable broker should inspect the house in order to conduct the open-house tour. Thus, a broker's knowledge of dangerous conditions in a given residence and the broker's ability to warn visitors of such defects is heavily contingent on whether it is reasonable under the circumstances for the broker to have inspected the premises or otherwise become familiar with the property in preparation for an open-house inspection and whether the broker had an adequate opportunity to do so.

We thus determine that a broker is under a duty to conduct a reasonable broker's inspection when such an inspection would comport with the customary standards governing the responsibilities and functions of real-estate brokers with respect to open-house tours. Those standards should ordinarily be elucidated by witnesses who are expert in the real-estate brokers' field. Such inspection should consist of an examination of the premises to ascertain the obvious physical characteristics that are material to its saleability, as well as those

features that a prospective purchaser would routinely examine during a "walk through" of the premises. Included are such features relating to the safety, not only of the customer as a potential buyer and ultimate owner or occupier of the home, but also of visitors who are present on the property on the invitation of the broker. That inspection would impose on the broker the duty to warn of any such discoverable physical features or conditions of the property that pose a hazard or danger to such visitors.

That duty, however, would not require the broker to warn against any dangers that are not otherwise known to the broker or would not be revealed during the course of such a reasonable broker's inspection. We note, as did the Appellate Division, "that the broker must take a modicum of care to assure by appropriate warning the reasonable safety of those whom he invites to the premises in his own economic interest." 252 *N.J.Super.* at 302, 599 *A.*2d 924. A broker's ability both to discover and subsequently to remedy defects is heavily constrained by the broker's limited and sometimes brief presence in the house. Consequently, a broker can be expected to discover or warn only of any dangerous conditions that the broker might reasonably discover while examining a residence in preparation for an open house.

As a point of comparison, we underscore the fact that a broker's duty does not replicate the more comprehensive duty owed by homeowners towards their invitees. "The broker is clearly not a guarantor of the safe condition of the premises." *Ibid.* at 302, 599 *A.*2d 924. The homeowner's duty to the business guest will be in most circumstances much broader than a broker's duty toward a customer. A homeowner is intimately acquainted with his or her residence and is consequently aware of many of the problems that remain hidden to the untrained or unfamiliar eye. Furthermore, the homeowner's duty necessarily involves using reasonable care to maintain the premises in a continuous state of safety.

In sum, we can envisage a broker's duty in the conduct of an open house as existing on a continuum that is intrinsically linked to whether a broker should have and in fact has had the responsibility and opportunity to become familiarized with a residence. The scope of a broker's duty is bounded, on one end, by the higher duty of care required of the actual homeowner. We do not expect that a broker, engaged in the marketing and sale of property, has the same intimate knowledge of the structural flaws or physical defects of a given home as the owners. At the other end of the spectrum is the situation in which a broker has no discernable or tangible duty arising from its presence on the property because the broker would not reasonably be required to inspect the property or have an opportunity to do so. *See, e.g., Christopher v. McGuire,* 179 *Or.* 116, 169 *P.*2d 879 (1946) (refusing to attribute duty to broker showing sole customer residence in which neither party had ever been previously present); *Turner v. Carneal,* 156 *Va.* 889, 159 *S.E.* 72 (1931) (same).

The dissent agrees with defendant's claim that the duty to inspect constitutes an unjustifiable economic burden on the residential real-estate industry with little or no added benefit to society. *Post* at 445–456, 625 *A.*2d at 1124. Defendant warns, with the concurrence of the dissent, *ibid.,* that realtors will not only have to develop an expertise in home inspection but will also be saddled with the additional costs of liability insurance and accident-prevention measures, which will be passed on to the consumer in one form or another.

We do not view the imposition of a duty to undertake a reasonable broker's inspection of a home for purposes of its sale to customers, and to give adequate warnings with respect to hazards readily discoverable through such an inspection, to be an unreasonable economic strain on a broker's livelihood. Given the economic benefits that inure to the broker from the open house itself, to ask the broker to internalize the costs associated with conducting its business is reasonable and fair. Moreover, it is not at all likely that the broker would be solely

responsible for the increased costs that may be associated in responding to such a duty of care. The actual owner, as earlier noted, remains primarily liable for the safety of all invitees on the property, including open-house visitors.

A broker may still retain a right of either contribution or indemnification from the homeowner, in the case of shared liability for a visitor's injury. *N.J.S.A.* 2A:53A–1 to –4; *See Holloway v. State*, 125 *N.J.* 386, 400–03, 593 *A.*2d 716 (1991); *Cartel Corp. v. Fireco.*, 81 *N.J.* 548, 565–70, 410 *A.*2d 674 (1979); *Adler's Quality Bakery, Inc. v. Gaseteria*, 32 *N.J.* 55, 77, 159 *A.*2d 97 (1960). Moreover, principles of comparative negligence also serve to distribute the costs and burdens of accidental injury among all involved parties. *N.J.S.A.* 2A:15–5.1 to –5.3. "Liability for resultant injury should mirror the responsibilities of the participants and be apportioned in accordance with their combined fault." *Renz, supra,* 87 *N.J.* at 456, 435 *A.*2d 540.

We have recognized the salutary effect of shifting the risk of loss and other associated costs of a dangerous activity to those who should be able and are best able to bear them. *People Express, supra,* 100 *N.J.* at 255, 495 *A.*2d 107. Those costs include the costs of preventing harm. Negligence has often been defined as the failure to take precautions that cost less than the damage wrought by the ensuing accident. *Id.* at 267, 495 *A.*2d 107; *see also United States v. Carroll Towing Co.,* 159 *F.*2d 169, 173, *reh'g denied,* 160 *F.*2d 482 (2d Cir.1947). Because realtors derive economic benefits from sponsoring an open house, they should be able to absorb the cost of accident prevention. *See* Guido Calabresi, *The Cost of Accidents: A Legal and Economic Analysis* 24 (1970); *Powell v. Fall,* 5 *Q.B.D.* 597, 605 (1880) (Bramwell, B.) (holding that profitable commercial industry should internalize cost of accidents rather than public at large).

In addition, the broker in a given case may actually be in a better position than the homeowner to prevent injury during

the course of an open house. The realtor would be acquainted with the actual situation and the specific problems associated with holding such an event. For example, the broker can anticipate the number of persons who would attend the open house as well as where they will wander and what they might examine, and should be better able to post temporary warnings or take other appropriate precautions to prevent injury.

Finally, we are satisfied that the public interest is served by recognizing a duty of care on the part of brokers. We strive generally to ensure that the application of negligence doctrine does not unnecessarily or arbitrarily foreclose redress based on formalisms or technicalities. *People Express, supra,* 100 *N.J.* at 255, 495 *A.*2d 107. However, one of the main functions of tort law is to prevent accidents rather than simply to provide legal redress to an injured party. Richard Posner, *Economic Analysis of Law* 78 (1972). One of the central rationales for imposing liability in tort law is to deter tortious behavior. The imposition of liability should discourage negligent conduct by fostering reasonable conduct and creating incentives to minimize risks of harm. *People Express, supra,* 100 *N.J.* at 266, 495 *A.*2d 107; *see Weinberg, supra,* 106 *N.J.* at 494, 524 *A.*2d 366.

We hold that a real estate broker has a duty to ensure through reasonable inspection and warning the safety of prospective buyers and visitors who tour an open house. The duty to conduct a reasonable inspection in the home arises when in connection with an open-house tour such an inspection is a part of the professional services that would be undertaken by a reasonable broker in attempting to sell the house on behalf of its owner and when the broker has had an adequate opportunity to have undertaken that inspection.

The scope of the duty to inspect and warn is limited only to defects that are reasonably discoverable through an ordinary inspection of the home undertaken for purposes of its potential sale. The broker is not responsible for latent defects

that are hidden and of which the broker has no actual knowledge.

The duty of real-estate brokers that we now recognize shall be prospective in nature, applicable only to events that occur after the date of this decision. We will, however, apply the doctrine to the present parties because plaintiff took the initiative to bring suit and should not be denied the success of its outcome and deprived of her cause of action. *Kelly, supra,* 96 *N.J.* at 551, 476 *A.*2d 1219.

We further emphasize that the existence of a duty by no means resolves the legal dispute between the parties. Although we are satisfied that a sufficient basis exists for finding that a broker has a duty for the safety of its customers who are visitors at an open-house tour, the trier of fact must ultimately determine whether under the circumstances of this case the broker breached a duty to Mrs. Hopkins.

### IV

A remaining question concerns whether expert testimony was necessary in order for plaintiff to establish the existence of a dangerous condition. At trial, plaintiff relied only on the testimony of lay witnesses and photographs of the step that had allegedly caused plaintiff to fall. Defendant, in contrast, produced the expert testimony of an architect, Russell McCorckle, who expressed the opinion that using the same type of floor covering on two levels of a connecting step would not produce an inherently defective condition. Both the trial court and the Appellate Division concurred that plaintiff had in fact established a *prima facie* case concerning whether the camouflaged step constituted a dangerous condition. Both courts determined that the jury could make that determination without the aid of expert testimony. Defendant, however, contends that expert testimony is necessary to determine whether the obscured step was somehow defective. It claims that whether the use of similar floor covering on two different levels is

reasonable is a question of good engineering practice, and hence expert testimony must be provided to answer that question.

In general, expert testimony is required when "a subject is so esoteric that jurors of common judgment and experience cannot form a valid conclusion." *Wyatt by Caldwell v. Wyatt*, 217 *N.J.Super* 580, 526 *A.*2d 719 (App.Div.1987) (holding that testimony of cause of accident was defective brakes inadmissible without expert testimony) (citing *Butler, supra,* 89 *N.J.* at 270, 445 *A.*2d 1141).

With regard to the step on which Mrs. Hopkins fell, the Appellate Division stated that "tripping on a step [that] one is not expecting and [that] is difficult to see does not involve a matter" that is beyond the comprehension of the jurors. 252 *N.J.Super.* at 300, 599 *A.*2d 924. *See Berger v. Shapiro*, 30 *N.J.* 89, 152 *A.*2d 20 (1959) (concluding that whether missing brick in top of step porch is negligently maintained defective condition held to constitute jury question). *But see Brody v. Albert Lifson & Sons*, 17 *N.J.* 383, 111 *A.*2d 504 (1955) (finding that expert testimony was necessary to prove that wet terrazzo floor constituted dangerous condition of property).

The crux of the lower courts' conclusion was that any juror, any person of average knowledge and ordinary experience, could determine by considering the testimony and by examining a photograph whether a step was "camouflaged" or obscured and whether that condition could cause an unsuspecting person to fall. We do not minimize the obvious fact, mentioned by the dissent, that the determination of whether a particular condition is dangerous will vary with the myriad situations that pose hazards to persons on property. See *post* at 454–455, 625 *A.*2d at 1123–1124.

Nevertheless, some hazards are relatively commonplace and ordinary and do not require the explanation of experts in order for their danger to be understood by average persons. We find that this case is one that can be comprehended by persons of

ordinary experience. It may be, as apparently viewed by the dissent, that a jury comprised of such average citizens would conclude that the condition of which plaintiff complains was not dangerous and should not result in the imposition of liability against the broker. *Post* at 454, 625 *A*.2d at 1123. Whether or not they reach that conclusion, it is *their* decision to make, and they are fully capable of making that decision without the assistance of experts. We thus agree with the view of the court that plaintiff has even without expert testimony established a *prima facie* case concerning the dangerous condition of the step. We also note that defendant was not precluded from offering its own expert testimony on why the use of identical floor covering did not constitute a defect or dangerous condition.

V

The judgment of the Appellate Division reversing the dismissal of the complaint by the trial court and remanding the matter for trial is hereby affirmed.

CLIFFORD, J., concurring in judgment.

Caught between a rock and a hard place—the rock of the Court's somewhat complex explication of the real-estate broker's duty, and the hard place of the dissent's near-hysterical forecast of doom, despair, destruction, and the demise of Western civilization—I write but briefly to express my concurrence with the Court's judgment.

At the outset I confess that (apparently unlike the rest of the Court) I see this case as, in today's parlance, "no big deal," in the sense of a cataclysmic change in the law. We just nudge the law forward an inch or so. True, for the first time we apply to real-estate brokers a duty to inspect and warn under certain circumstances. But those circumstances are severely circumscribed (the context of an open-house tour); those to whom the duty extends comprise only a limited class (prospec-

tive buyers and visitors); and the duty itself is founded on well-established, even hoary, authority (the majority opinion, a stunning masterpiece of scholarship, reaches back to reacquaint us with cherished old friends such as *Palsgraf v. Long Island Railroad Co.*, 248 *N.Y.* 339, 162 *N.E.* 99 (1928), and *Heaven v. Pender*, 11 *Q.B.D.* 503 (C.A.1883)!). Take, for instance, the following from one of the more contemporary cases cited in the majority opinion:

> The traditional test of negligence is what a reasonably prudent person [here, a real-estate broker] would foresee and do in the circumstances [here, the tour of an open-house by prospective buyers and invitees]; duty is clearly defined by knowledge of the risk of harm or the reasonable apprehension of that risk.
>
> [*People Express Airlines, Inc. v. Consolidated Rail Corp.*, 100 *N.J.* 246, 262, 495 *A.*2d 107 (1985).]

Unlike our dissenting colleague, therefore, I am satisfied that more than ample authority supports the imposition of a duty on the broker "to inspect and warn [only of] defects that are reasonably discoverable through an ordinary inspection of the home undertaken for the purpose of its potential sale." *Ante* at 448, 625 *A.*2d at 1120.

However, rather than complicate the matter by requiring expert proof of the "customary standards governing the responsibilities and functions of real-estate brokers with respect to open-house tours," *ante* at 444, 625 *A.*2d at 1118, I would be content to leave the law pretty much as stated in the Appellate Division's neat little six-page opinion, reported at 252 *N.J.Super.* 295, 599 *A.*2d 924 (1991). Relying on the *Restatement (Second) of Torts* section 383 (1969), that court held that

> the broker has a duty to warn his invitees of dangerous conditions on the premises of which he has actual knowledge and [that] he should expect that the invitees will not discover for themselves. * * * [H]e has as well a duty to make a reasonable inspection of the premises prior to the arrival of his invitees to determine if there are any reasonably discoverable dangers requiring such a warning.
>
> [252 *N.J.Super.* at 302, 599 *A.*2d 924.]

Judges and juries parse their way through issues based on those stated principles of law every day, and I foresee no

difficulty in their accommodating those concepts to the setting of this case.

The dissent reminds us, *post* at 455–456, 625 *A*.2d at 1124, that "[b]rokers currently charge a sizeable commission fee to sell a house." I perceive no intolerable burden, no injustice, in requiring them to take a look around and tell folks about any reasonably-discernable dangers before they stroll through on an open-house tour. Remember: we are talking "open house" here, not "open season" on brokers. As the Appellate Division observed:

> The broker is clearly not a guarantor of the safe condition of the premises. He is not responsible for latent defects of which he has no knowledge. He is not required to correct any defects of which he does have knowledge. He is not required to warn against any dangers beyond those [that] would be revealed by a reasonable broker's inspection designed to assure the safety of prospective buyers touring the house. But the broker must take a modicum of care to assure, by appropriate warning, the reasonable safety of those whom he invites to the premises in his own economic interest.
>
> [252 *N.J.Super.* at 302, 599 *A*.2d 924.]

I concur in Part IV of the Court's opinion and in the judgment affirming the Appellate Division.

GARIBALDI, J., dissenting.

Today for the first time the Court imposes an expansive, ambiguous, and vague liability on real-estate brokers for injuries sustained by an open-house visitor. Unable to find the authority to impose such liability under statutory law, the law of agency, the law of contracts, or even under the traditional common-law approach to landowner or occupier tort liability, the Court's authority is instead "rooted in the philosophy of the common law." *Ante* at 438, 625 *A*.2d at 1115–1116. To determine the liability imposed on a specific broker "courts will be required to draw on notions of fairness, common sense and morality in order to fix the limits of liability as a matter of public policy." *Ante* at 443, 625 *A*.2d at 1118. All this for a simple slip-and-fall accident in which the injured party already has readily available redress against the homeowner, the bro-

ker's principal who has control and possession of the property and the knowledge and authority to make the necessary repairs. Neither the law nor public policy require the creation of further needless litigation when the injured party already has adequate redress for her injuries. The Court's decision to impose liability on real estate brokers who conduct open houses is unreasonable, impractical, and unnecessary.

By converting real-estate brokers into home inspectors, the opinion raises more questions than it answers. Nowhere among the citations to Posner, Horwitz, or other legal luminaries does the majority define the new duty it now imposes. The opinion sets boundaries, but the nebulous standards set by the majority and the concurrence provide no guidelines for brokers. Fairness requires that one be able to ascertain what one's duty is and how it can be performed. Consider the inevitable vagueness and impracticality of the majority's decision. How can a broker know what constitutes a "dangerous condition?" If a jury can find that a step "camouflaged" with the same color linoleum as the surrounding area is a "dangerous condition," then what other common features in a house will be considered perilous to the unsuspecting open-house attendee? What exactly must a broker do?

Must a broker arrive at the site early, inspect the premises and then post warning signs on all steps, low ceilings, railings, hanging plants, newly-waxed floors, and other potential "dangerous conditions"? Must the broker tidy up the house and pick up errant skateboards or banana peels? Or must the broker escort people who might prefer to look at the home without an eager salesperson hovering around, so that the broker can point out all potential safety hazards? Or should the broker greet the potential purchasers at the door with a list of conceivable hazards? I wonder how a well-meaning broker, attempting to comply with the majority's ruling, will handle the problem, and how his or her solution will affect the salability of the property and the broker's relationship with the principal, the seller.

The broker, as agent for the seller, has a legal and fiduciary obligation to act in the principal's best interest. *Ellsworth v. Dobbs, Inc. v. Johnson*, 50 *N.J.* 528, 553, 236 *A*.2d 843 (1967). Although the majority recognizes the agency relationship between broker and seller, it fails adequately to address the conflict of interests that would arise if the broker who works for the seller is forced by this Court to disclose defects that the seller does not want disclosed.

Finally, we look to the public interest in the proposed, and in my view unnecessary, solution. Although open-house real-estate dealings are fairly common, not only does no statutory authority exist for the majority's proposition, no common-law authority exists in this state or in forty-eight other states for the imposed liability. The only state that has imposed this broker liability, Washington, did so in a case in which the broker had admitted that he had possession and control of the premises, and in which the prospective buyer was injured while roaming unescorted through an active construction site. See *Jarr v. Seeco Construction*, 35 *Wash.App.* 324, 666 *P*.2d 392 (Ct.App.1983).

The only two other states that have even considered the question have refused to impose such a duty. See *Christopher v. McGuire*, 179 *Or.* 116, 169 *P*.2d 879 (1946) (holding broker not liable when plaintiff injured after following broker's suggestion to test strength of porch fence); *Turner v. Carneal*, 156 *Va.* 889, 159 *S.E.* 72 (1931) (finding broker who was authorized to make minor repairs to property not liable to plaintiff who fell through open trap door). Clearly, broker liability is not a public policy that is evoking great support or interest anywhere else in the nation.

Tort law has two goals. One is to make an injured plaintiff whole, and the other is to deter. *Prosser and Keeton on Torts* § 4 (5th Ed.1984) (noting compensation for losses and "prophylactic" factor of preventing future harm are primary considerations in tort law). Today's ruling does neither. All this

decision will do is increase litigation by clogging the dockets with new parties for plaintiffs to sue. Plaintiff has already sued the current homeowners, prior homeowners, the builder, and the architect in this case. Why does plaintiff need another party to sue? Plaintiffs injured in a seller's house already have recourse through the seller's homeowner's insurance. All this ruling does is make it more expensive for all parties concerned—except the lawyers who will file and defend these new suits.

Brokers currently charge a sizeable commission fee to sell a house. The concurrence acknowledges that and argues in the next sentence that there is "no intolerable burden, no injustice, in requiring [brokers] to take a look around and tell folks about any reasonably-discernable dangers * * *." *Ante* at 453, 625 A.2d at 1122–1123. But the "burden" the majority imposes is not only on the broker but on the homeowner and the prospective buyer. Because of the newly-created duty to inspect and warn, brokers forced to defray the cost of the additional liability insurance will simply add costs to the commission. Moreover, as the majority recognizes, the broker still would retain the right of either contribution or indemnification from the homeowner. Thus, in the end, the homeowner will pay even more to insure against injuries that might occur in the home, while the brokers will have no more incentive to inspect and warn. than they did before today's decision.

In addition, the smart homeowner, saddled with new costs, will simply increase the asking price for the house. Therefore, the potential buyer will have to pay more for a house, which has had costs added to the purchase price, all in the name of the buyer's protection.

Rather than serving the public, the majority's decision will add extra layers of litigation, paperwork, and cost to the already complex and expensive process of selling and buying a house. Because I believe that the ruling is unnecessary, im-

practical, unreasonable, potentially expensive, and unenforceable, I dissent.

. *For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN and STEIN—5.

*For reversal and remandment*—Justice GARIBALDI—1.

*For concurrance in result*—Justice CLIFFORD—1.