NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5419-12T4

FELIX PEGUERO,

    Plaintiff-Appellant/
Cross-Respondent,

v.

TAU KAPPA EPSILON local chapter,
TAU KAPPA EPSILON national chapter,
GREG SPINNER, and THOMAS PRICE,

    Defendants-Respondents,

and

CARL TATTOLI and ALEX DE SOUSA,
improperly impleaded as
ALEX DE SOUZA,

    Defendants-Respondents/
Cross-Appellants,

and

CHARLTON STANTON, JESSE ALAVA,
ELIO BUSTAMONTE, and MATTHEW FILO,

    Defendants.

| APPROVED FOR PUBLICATION |
| :---: |
| January 15, 2015 |
| APPELLATE DIVISION |

_____

Argued December 1, 2014 - Decided January 15, 2015

Before Judges Sabatino, Guadagno, and Leone.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-3195-10.

Michael A. Orozco argued the cause for appellant/cross-respondent Felix Peguero (Price, Meese, Shulman & D'Arminio, P.C., attorneys; Mr. Orozco and Terence Steed, on the briefs).

David P. Bateman (Bateman Caliendo, LLC) argued the cause for respondents Tau Kappa Epsilon local chapter & Tau Kappa Epsilon national chapter (Mr. Bateman and Craig M. Caliendo (Bateman Caliendo, LLC), attorneys; Messrs. Bateman and Caliendo, on the brief).

David A. Christie, Jr., argued the cause for respondent/cross-appellant Carl Tattoli (Law Office of Debra Hart, attorneys; Mr. Christie, of counsel and on the brief).

William C. Bochet argued the cause for respondent/cross-appellant Alex De Sousa (Muscarella, Bochet, Edwards & D'Alessandro, P.C., attorneys; Mr. Bochet, on the brief).

Respondents Greg Spinner and Thomas Price have not filed briefs.

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This appeal implicates the legal duties that a college fraternity and its officers or members may owe to guests who are injured while attending social gatherings at premises used as a fraternity house.

Plaintiff attended a large party hosted at a private residence rented by several fraternity members. After consuming several drinks, plaintiff interceded in an argument that erupted in the backyard among other persons who were at the party.

While trying to assist a friend involved in that argument, plaintiff was shot and wounded by another person who was at the party. The shooter was never apprehended or identified. There was no evidence that the fraternity had any past incidents involving guns on the premises or involving violent criminal behavior.

Plaintiff brought a negligence action against the national fraternity, the local fraternity chapter, and several students who were officers or members of the fraternity. Defendants moved for summary judgment, which the trial court granted.

We affirm the summary judgment order because we agree with the motion judge that there was no evidence showing that it was reasonably foreseeable that plaintiff would have been shot by a third party while attending the fraternity event. Hence, defendants who leased the house breached no legal duty to plaintiff in these circumstances and were therefore entitled to a judgment dismissing his negligence claims.

I.

Between 10:30 p.m. and 11:00 p.m. on Friday, September 5, 2008, plaintiff Felix Peguero and a friend arrived at a large party taking place at a house in Elizabeth. The party was being hosted by members of the local chapter of Tau Kappa Epsilon, Tau Lambda ("TKE local") of the Tau Kappa Epsilon ("TKE national")

fraternity.[1]   TKE local is chartered by TKE national and is

affiliated with Kean University[2] in Elizabeth.  Both TKE national

and TKE local are nonprofit organizations, and both entities

were named as co-defendants in this case.

According to deposition testimony of TKE local's vice

president, who joined TKE the year after the shooting, seven

fraternity brothers[3] were renting the house from the property

owner as of the fall of 2008.  The owner did not live on the

property, nor did any other tenants.  The rental arrangements

were informal and not embodied in a written lease.  The

residence was not recognized by TKE national organization as an

"official chapter house," although the record suggests that the

---

[1]  TKE national's full legal name is Tau Kappa Epsilon
International Fraternity, Inc.

[2] The University is not a party to the litigation.  The record
indicates that the University permits students to join
fraternities, but that it does not allow fraternity houses.

[3]  Those fraternity brothers (Greg Spinner, Charlton Stanton,
Jesse Alava, Thomas Price, Elio Bustamonte, Matthew Filo and
Anthony De Sousa) were named as defendants in this case.  The
complaint names another fraternity brother, Carl Tattoli, as an
additional defendant, although Tattoli apparently was not part
of the rental arrangements.  Plaintiff did not affect service of
process on Stanton and Bustamonte.  Plaintiff did serve Alava
and Filo, who defaulted.  Spinner and Price entered into a
consent judgment after the court granted summary judgment in
favor of the other active defendants.  The consent judgment
specified that it was "subject to being vacated" if the summary
judgment order were reversed on appeal.  Hence, the only
individual defendants participating as respondents on this
appeal are Tattoli and De Sousa.

house was regarded by students and other guests as having an affiliation with TKE.

Plaintiff, who was twenty-one years old and employed at the time of the shooting, was neither a member of TKE nor a student at Kean University or any other college. However, he had attended social events at the house approximately fifteen to twenty times in the past. When there, he noticed items in the house with TKE insignia. Plaintiff also recalled that the fraternity brothers at times would chant when parties took place there. The friend who accompanied plaintiff to the house on the night of the shooting also was not a Kean student nor a member of TKE.

The parties dispute the nature of the social gathering on the night in question. Plaintiff believed that it was a fraternity-sponsored event. The TKE defendants disagree, contending that the occasion was only a birthday party for a female friend.

In any event, the record indicates that the party drew a large crowd. Plaintiff estimated at his deposition that seventy-five to one hundred guests were in attendance. Certifications from two other witnesses gave a higher figure, although we will use plaintiff's estimate for purposes of our analysis.

According to plaintiff, when he arrived at the party, he paid a $5.00 charge and received a red plastic cup, which he used for drinking beer at the event. He contends that he paid a similar "cover charge" when he previously attended at least five other events at the house. Defendants dispute the charge and deny that any such charge, if it were imposed, related to the provision of alcohol.[4] By his own admission, plaintiff drank about five-and-a-half cups of beer between the time of his arrival and the shooting incident.

At about 1:30 a.m., a fight broke out in the backyard of the premises. Plaintiff decided to go outside with one or more of the fraternity brothers and attempt, as he phrased it, to "diffuse" the situation. As plaintiff recounted at his deposition:

> We go into the back yard, and lo and behold there's an altercation. I saw that one Hispanic guy there, and all the other guys were instigating, Get out of town. They were saying, Go back to New York. That's how I knew that someone who I'm acquainted with was there and being harassed. He was trying to get into his car, a friend of mine . . . [.] They were saying, Go to New York. My impression, not being from here, they said he was from New

---

[4] We need not address whether the $5.00 charge, if indeed it was collected in connection with the provision of alcohol, would be in violation of the State's liquor laws and regulations. See N.J.S.A. 33:1-1 to -97.

> York, and then they perpetuated more, pushing around TKE members, pushing my friends around.
>
> I felt a sense of duty to try to break this situation up. In between trying to separate people, I guess, someone from the assailing party took that the wrong way and attacked me. That's how it all began.

According to plaintiff, the fight initially involved about five people, some of whom he perceived to be together. He recalled that after he attempted to intercede, he observed for the first time a person holding a handgun:

> I put my hands in between someone who I knew and someone else. I said, Chill.
>
> I looked over to the side, and that's when the big, stocky guy —— <u>someone put a weapon in his[5] face, a gun, and that's when I said, wow. This turned up a notch</u>.
>
> So I grabbed my friend, who was on the floor. I don't know if he slipped or tripped or was pushed. I picked him up to walk away from the situation. That's when I was attacked. I don't know whether that individual who was standing up felt disrespected or offended because I pulled my friend away.[6] <u>I was trying to get away as soon as possible when I saw the weapon</u>.
>
> [(Emphasis added).]

---

[5] Although not clear, plaintiff's reference to the person who was placed at gunpoint likely refers to a brother in the TKE local who was taking part in the melee or attempting to break it up.

[6] Plaintiff identified this person as a friend he knew from the neighborhood, who likewise was not a member of the fraternity.

Upon picking up his friend, plaintiff was punched and then shot. As he described it:

> I was walking away with him [the friend]. The gentleman came and attacked me. I got hit in the face twice. So I put my hands up in the defense of kind of grappling, trying to deflect punches and from that point I heard some gun shots[.]
>
> . . . .
>
> At that point, I proceeded to run, and I realized that I couldn't necessarily move. I felt a lot of burning in my chest. So I looked down.

Plaintiff sustained one gunshot wound to the chest. He eventually learned that the bullet had grazed his spine, punctured his lung and diaphragm, and exited through his right rib cage. After the bullet passed through plaintiff, it ricocheted and injured a member of the fraternity.[7]

The identity of the person who shot plaintiff is still unknown. Apparently, plaintiff had observed the assailant at the party before the melee. Two other guests who had been at the party confirmed in certifications that they both recalled seeing the assailant about thirty minutes before the shooting. Plaintiff described the individual as someone who did not "seem like he was meshing with the party." There was no proof that

---

[7] There is no indication that this other gunshot victim filed suit.

the shooter was a minor or a visibly intoxicated person who had been served alcohol at the party.

Plaintiff further recalled in his deposition that the shooter was accompanied by four other men, only one of whom he could describe with any detail. Although he was unsure of the criteria used that night for gaining admittance to the party, plaintiff presumed that the shooter was a friend of someone else who was in attendance.

There is no claim, nor any indication in the record, that the shooter was a fraternity member or a Kean student. There is also no proof that he was a minor, or that he had been served alcohol at the event. Nor is there any proof that he had been seen by plaintiff or any of the defendants carrying a gun on the premises, until he brandished and fired it during the backyard altercation.

Plaintiff had not seen a gun on the premises during any of his multiple prior visits. Nor is there evidence that any other witnesses had seen a gun there previously. Plaintiff did recall once seeing a serrated knife in a fraternity brother's bedroom on a prior occasion, but he had no evidence that the knife had been used to harm anyone.

The only prior incident of violent conduct at the house that plaintiff could specifically recall was an incident in

which a male had whispered something to a female, and the female "smacked him." Plaintiff acknowledged that this altercation was quickly resolved. However, he did assert, more generically, that "fights or altercations" took place at the house "every two or three parties."

The property did not have a track record of prior violent incidents. According to the deposition testimony of Tattoli, the police had come to the house on only one prior occasion, in response to a noise complaint caused by loud music. There were no prior incidents involving a weapon. TKE local had been sanctioned twice by the University for rush-related violations in the fall of 2005 and the fall of 2007, but none of those rush incidents involved violent conduct.

TKE national does promulgate certain risk management and alcohol guidelines. According to those guidelines:

> The possession, sale, use or consumption of alcoholic beverages . . . in any situation sponsored or endorsed by the chapter . . . must be in compliance with any and all applicable laws of the state . . . and institution of higher education, and must comply with either the B.Y.O.B. or Third Party Vendor Guidelines.

The guidelines also prescribe that "[n]o alcoholic beverages may be purchased through chapter funds;" that "[o]pen parties[8] . . . shall be prohibited;" and that "[n]o members shall . . . serve to, or sell alcoholic beverages to any minor."

In addition to these risk management guidelines, TKE national's separate alcohol guidelines state that "[i]f alcohol is being served, [the local chapter needs] to utilize a third-party vendor," with certain insurance requirements.

According to the deposition testimony its Chief Executive Officer, TKE national treats each local chapter as "its own" entity, and expects the local to be responsible for adhering to the organization's standards. As he described it, TKE national typically interfaces with the local chapter only once or twice a semester, and even then mainly to assure that fees and insurance premiums are being paid and to address membership, philanthropy, and community service activities.

After suffering his gunshot injuries, plaintiff filed the present negligence action in the Law Division against TKE national, TKE local, and several individual officers or members of the fraternity or residents of the house. Service of process was delayed as to two of the individual defendants, Tattoli and

---

[8] Open parties are defined as "those with unrestricted access by non-members of the Fraternity."

De Sousa, who had originally been identified only as "John Doe" fictitious defendants. The delay prompted them to bring motions to dismiss the claims against them as untimely under the statute of limitations. The trial court denied their applications, concluding that plaintiff had acted with sufficient reasonable diligence in naming and serving them.

Following the completion of discovery, defendants moved for summary judgment, arguing that the shooting of plaintiff by the unidentified assailant was an unforeseeable criminal act, and that they owed no duty to protect plaintiff from that event. Plaintiff contended that defendants could have and should have envisioned that a violent incident would occur at the party, given the enormous crowd that had gathered at the house, the widespread consumption of alcohol, and the lack of effective controls on who entered the premises.

After considering these arguments, Judge Lisa F. Chrystal granted summary judgment to defendants and dismissed plaintiff's claims. In her detailed seventeen-page written decision issued on January 17, 2013, Judge Chrystal identified and applied the relevant principles of tort law, agreeing with defendants that they had violated no legal duty to plaintiff in failing to prevent this unfortunate shooting. As the judge summarized her reasoning:

> Here, there is no evidence of discipline or suspension of TKE by Kean University for violent acts or criminal behavior. There is also no evidence of any incidents or arrests at [the house] by the Elizabeth Police Department. The only record of interaction between the police and [the house] was in regard[] to noise complaints. Though plaintiff testified that "every two or three parties someone gets into an argument," plaintiff was only able to describe one argument wherein a woman slapped a man after he whispered something in her ear. There is also no evidence of criminal acts at other fraternities or at Kean University before this [c]ourt. Further, there is no evidence that TKE or its local officers knew or were expecting the assailants who shot plaintiff. As such, <u>there is simply no evidence to demonstrate that it was foreseeable that plaintiff would be shot while attending a party at [the house]. Therefore, TKE and the individual defendants owed no duty to plaintiff to protect him from the criminal acts of third parties</u>.
>
> [(Emphasis added).]

The judge thereafter denied plaintiff's motion for reconsideration.

Plaintiff now appeals the trial court's rulings. Although he does not quarrel with the legal principles identified in the judge's decision, he contends that the judge misapplied the "totality of the circumstances"[9] test for the recognition of a legal duty and also overlooked "significant factual evidence."

---

[9] <u>See</u> <u>Clohesy v. Food Circus Supermarkets</u>, 149 <u>N.J.</u> 496, 516–17 (1997).

Fundamentally, he maintains that the judge erred as a matter of law in concluding that the individual fraternity residents and officers, as well as TKE national and TKE local, did not owe him a duty of care to prevent his gunshot injury. We consider those arguments by reviewing the factual record in a light most favorable to plaintiff, consistent with the summary judgment standard. R. 4:46-2(c); W.J.A. v. D.A., 210 N.J. 229, 237-38 (2012).

Defendants Tattoli and De Sousa have provisionally cross-appealed the judge's denial of their motion to dismiss the claims against them under the two-year statute of limitations, N.J.S.A. 2A:14-2(a).

## II.

No reported cases to date in this State have yet addressed the scope of duties that may be owed by a college fraternity, or its officers or members, to protect guests from violent conduct that may occur at a social event hosted by members of a fraternity. As Judge Chrystal appropriately recognized, however, general principles of tort law can be applied. For the reasons that follow, we agree with her sound conclusion that defendants in this case breached no duty of care to plaintiff in somehow failing to prevent his unfortunate shooting by an unidentified assailant who happened to be at the party.

Plaintiff's common-law negligence[10] claims essentially arise under the law of premises liability, as he was injured while visiting the house rented and occupied by the fraternity brothers. The general applicable principles of premises liability in our state are well established, albeit evolving in some respects in recent case law.

Premises liability is a subset of general negligence law. "In New Jersey, as elsewhere, it is widely accepted that a negligence cause of action requires the establishment of four elements: (1) a duty of care, (2) a breach of that duty, (3) actual and proximate causation, and (4) damages." Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 594 (2013).

Of central import for purposes of this appeal is element number one, namely, the duty of care. The issues of whether a defendant owes a legal duty to another and the scope of that duty are generally questions of law for the court to decide. Carvalho v. Toll Bros. & Developers, 143 N.J. 565, 572 (1996); Kelly v. Gwinnell, 96 N.J. 538, 544-45 (1984). We therefore review de novo the trial court's legal determination that

---

[10] Significantly, plaintiff pleads no statutory claims under the social host liability laws, N.J.S.A. 2A:15-5.6 to -5.7. Nor could plaintiff successfully advance any claims under that statute here, because there is no proof that the shooter was served any alcohol at the house, or that he was served alcohol while visibly intoxicated. N.J.S.A. 2A:15-5.6.

defendants owed no duty to protect plaintiff from being shot by this third-party assailant. <u>Manalapan Realty, L.P. v. Twp. Comm. of Manalapan</u>, 140 <u>N.J.</u> 366, 378 (1995).

As the Supreme Court recently instructed, in cases such as the present one where the duty of care is not well settled, the court must engage in a so-called "full duty analysis." <u>Desir, Estate of ex rel. Estiverne v. Vertus</u>, 214 <u>N.J.</u> 303, 317 (2013). Such an "analysis rests upon whether the imposition of a general duty to exercise reasonable care to prevent foreseeable harm is fair and just under the circumstances." <u>Ibid.</u> (citing <u>Hopkins v. Fox & Lazo Realtors</u>, 132 <u>N.J.</u> 426, 434 (1993)).

Since the time of the Court's decision in <u>Hopkins</u>, the duty analysis in our State has focused upon several factors: the relationship of the parties; the nature of the attendant risk; the opportunity and ability to exercise care; and the public policy considerations. <u>Ibid.</u> The application of these four factors is "both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct." <u>Hopkins</u>, <u>supra</u>, 132 <u>N.J.</u> at 439. The foreseeability of the harm involved is one of the many considerations in assessing whether a duty is owed. <u>See, e.g.</u>, <u>Desir</u>, <u>supra</u>, 214 <u>N.J.</u> at 317 (noting that a duty of care can be owed "if the

source of the injury is a dangerous condition on the premises and if the injury is the result of a foreseeable risk to an identifiable person").

Moreover, "'[w]hether a duty exists is ultimately a question of fairness.'" Ibid. (quoting Weinberg v. Dinger, 106 N.J. 469, 485 (1987)). Indeed, as the Supreme Court emphasized, "the function of the law, and in particular the common law governing tort recoveries, cannot be driven by sympathy or overshadowed by the effects of tragedy." Id. at 329 (emphasis added). "Rather, the function of tort law is deterrence and compensation, and absent circumstances in which the definition of the duty can be applied both generally and justly, [a court] should stay its hand." Id. at 329-30.

As a result of case law applying these core concepts, a landowner generally has a duty to maintain the safe condition of its property for the protection of persons who lawfully enter the premises. Rowe v. Mazel Thirty, LLC, 209 N.J. 35, 43-44 (2013); see also Reyes v. Egner, 404 N.J. Super. 433 (App. Div. 2009), aff'd as modified, 201 N.J. 417 (2010). Although traditionally the extent of that duty was dictated by common-law classifications of whether the plaintiff on the premises was an invitee, a licensee, or a mere trespasser, modern case law has eschewed such rigid categories and instead adopted a more

flexible analysis rooted in considerations of reasonable care. Hopkins, supra, 132 N.J. at 436-39; see also Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 51 cmt. a (2012) (noting that the "status-based duties for land possessors are not in harmony with modern tort law").

We reject defendants' argument in their brief suggesting that they are absolved of any duty to maintain the safe condition of the residence in this case because the fraternity brothers rented the house from a landlord. Although in some instances a renter of property may have limited or no responsibility for the condition of the premises, the law has recognized that renters, at times, may be in the best position to avoid or remove a known hazard, as opposed to an absent landlord. Cf. Reyes, supra, 404 N.J. Super. at 450-55 (recognizing this principle but holding, under the facts of that case, that a tenant who rented a beach house for two weeks was not in the best position to identify and correct a hazard to visitors); see also Restatement (Second) of Torts § 328E (1965) (defining a possessor of land, for purposes of establishing a duty of care, as "a person who is in occupation of the land with the intent to control it"); Restatement (Third) of Torts, supra, § 49(a) (similarly defining a possessor of land). In fact, at oral argument on the appeal, defense counsel acknowledged that,

for example, if the fraternity brothers had brought a block of ice on site for the party and the melting ice created a dangerous wet floor, they could have had a duty to take reasonable measures to mop it up and prevent an injury to one of their guests.

We need not hinge our duty analysis in this case upon whether the party hosted by the fraternity brothers rendered the house a "commercial" establishment for purposes of premises liability. In Gilhooly v. Zeta Psi Fraternity, 243 N.J. Super. 201, 207-08 (Law Div. 1990),[11] the court concluded that a fraternity, as a landowner in that case, could be subject to liability for negligent maintenance of the house's sidewalk area, given the defendant's hybrid use as a commercial and residential property. However, we cast doubt upon that reasoning in another sidewalk liability case, Avallone v. Mortimer, 252 N.J. Super. 434 (App. Div. 1991), involving a hybrid commercial/residential building, although Avallone did not involve a fraternity. See also Luchejko v. City of Hoboken, 207 N.J. 191, 211 (2011) (holding that a condominium complex was "residential" and therefore not subject to sidewalk liability).

---

[11] Gilhooley is the only reported New Jersey case involving a fraternity's potential liability for injuries occurring on the premises. Unlike the present case, it did not involve an injury to a fraternity guest caused by a third-party's violent criminal act.

Because the shooting of plaintiff was not reasonably foreseeable, it does not matter if we classify the fraternity in this case as a commercial or a noncommercial defendant. Hence, we need not consider, despite plaintiff's urging that we do so, whether the alleged five-dollar cover charge for the party affected the fraternity's legal status. Even if the house were deemed a "commercial" location, defendants would be liable only if the shooting was reasonably foreseeable. Butler v. Acme Markets, Inc., 89 N.J. 270 (1982).

The most analogous case law within our State to consider here relates to the narrow instances in which a plaintiff was injured by a criminal act on the defendant's premises and claimed that the defendant was liable in failing to take measures that might have prevented that conduct. The two key Supreme Court cases on this subject are Butler, supra, 89 N.J. at 270 and Clohesy, supra, 149 N.J. at 496, neither of which proves helpful to plaintiff on the facts in this case.

In Butler, the plaintiff, a shopper at the defendant's grocery store, was attacked, robbed and injured in the store's parking lot. Butler, supra, 89 N.J. at 274. The evidence showed that there had been seven muggings on the premises in the prior year, five of which occurred in the evenings during the four-month period preceding the plaintiff's attack. Ibid. Despite

this pattern of repeated on-site muggings, the store only assigned a single security guard to the premises, who primarily remained inside the store. Id. at 274-75. The Court held that under these circumstances, the store owed a duty to either warn or provide adequate security protection to its endangered patrons. Id. at 280-82.

Thereafter, in Clohesy, the Supreme Court dealt with the kidnapping and murder of a seventy-nine-year-old woman from a supermarket parking lot. Id. at 500. In assessing whether the defendant grocery store owed plaintiff a duty of care to prevent such criminal acts, the Court adopted a "totality of the circumstances" analysis. Id. at 514. Under such an approach, the Court ruled that the criminal act in that case, despite other prior criminal acts on the premises, was sufficiently foreseeable, given that (1) theft offenses frequently escalate into more violent crimes, (2) the crime rate in the defendant's area had increased substantially in the previous two years, and (3) recent crime statistics indicated that approximately 757,000 violent crimes such as rape, robbery and assaults occurred in parking lots located throughout the nation. Ibid.

The foreseeability assessment here is far different. As Judge Chrystal aptly recognized, there was no previous pattern of criminal conduct at the fraternity members' house that would

have or should have alerted the individual defendants that an unknown third-party would pull out a gun and shoot at another guest in the backyard. The slim evidence plaintiff offers about having once seen a knife in a bedroom and witnessing sporadic arguments on the premises are not the sort of events that would likely escalate into gunfire at a party. The evidence does not come close to the sort of proof that would give rise to a duty to have prevented the gunfire here.

No witness saw the shooter possessing a gun, drinking heavily, acting belligerently, or otherwise displaying a volatile or dangerous propensity until the argument in the backyard erupted. Nor could it be reasonably foreseen that plaintiff would attempt to intercede in the altercation. Although the house was crowded and evidently a copious amount of beer was flowing, there was no proven or reasonably foreseeable link between those factors and the sudden discharge of a handgun.

Foreseeability is essentially "based on the defendant's knowledge of the risk of injury." Podias v. Mairs, 394 N.J. Super. 338, 350 (App. Div.), certif. denied, 192 N.J. 482 (2007). "In the end, a court must assess the totality of the circumstances that a reasonable person would consider relevant in recognizing a duty of care to another." Robinson v.

<u>Vivirito</u>, 217 <u>N.J.</u> 199, 209 (2014) (citing <u>Clohesy</u>, <u>supra</u>, 149 <u>N.J.</u> at 508). Here, we fully concur with the trial court's conclusion that the occurrence of gunfire at the party was not reasonably foreseeable, even viewing the record in a light most favorable to plaintiff.

In reaching that conclusion, we do not suggest (and nor does defense counsel) that a fraternity or its members could never be liable for criminal or other dangerous behavior that occurs during the course of a party hosted by fraternity members. We are cognizant of the tragic consequences of hazing, excessive drinking, sexual assaults, and other harmful acts that have occurred at fraternity houses or at other fraternity events. We applaud efforts that are being made to prevent such tragedies. But the facts here do not even approach a proper basis for imposing civil damages liability upon these defendants.

Applying the four-factor duty analysis prescribed by <u>Hopkins</u>, <u>supra</u>, 132 <u>N.J.</u> at 439, we agree with the trial court that defendants owed no legal duty to prevent this criminal act. The relationship of the parties and the shooter was transitory, and there is no proof that the fraternity defendants had any particular knowledge of the unknown assailant.

23

The nature of the risk is unclear given that a violent criminal act, such as the shooting, is not one that is normally associated with a social gathering of this nature. Thus, this situation stands in stark contrast to situations where the risk is reasonably well-defined. See, e.g., Kelly, supra, 96 N.J. at 548.

The opportunity and ability of the fraternity to have exercised care to prevent the gunfire in this case is theoretical at best. Plaintiff has provided no expert witness or other persuasive basis to support the notion that the fraternity should have installed a metal detector or frisked the guests who arrived at the party. Even if the fraternity brothers had demanded and checked identification of all guests entering the house, there is no reason to believe that the shooter's mere display of identification would have revealed to anyone that he was likely to be carrying a loaded weapon.

The public interest also does not warrant the recognition of the expansive duty of protection advocated by plaintiff. Even assuming, for the sake of discussion, the shooting somehow could be deemed reasonably foreseeable, the Supreme Court has cautioned that "imposing a duty based on foreseeability alone could result in virtually unbounded liability," and case law has been "careful to require that the [duty] analysis be tempered by

24

broader considerations of fairness and public policy." <u>Desir</u>, <u>supra</u>, 214 <u>N.J.</u> at 319 (citing <u>Kuzmicz v. Ivy Hill Apts.</u>, 147 <u>N.J.</u> 510, 515 (1997)).  The imposition of a duty in these circumstances would inject "far more confusion and uncertainty than such a rule should express if it is to be a useful tool." <u>Desir</u>, <u>supra</u>, 214 <u>N.J.</u> at 328.

The case law in the few other states that have addressed issues of fraternity tort liability does not support plaintiff's claims in this case.  Indeed, in several reported out-of-state cases, a defendant fraternity or its officers and its members was found not liable in tort to an injured guest on the facts presented.  <u>Ostrander v. Duggan</u>, 341 <u>F.</u>3d 745, 749 (8th Cir. 2003) (finding that the defendant fraternity had no duty to protect plaintiff from a sexual assault because the plaintiff "adduced no evidence that would cause a reasonable person to foresee injury to herself or other female visitors arising from sexual misconduct at the [fraternity] premises"); <u>Rogers v. Sigma Chi Int'l Fraternity</u>, 9 <u>N.E.</u>3d 755, 765 (Ind. Ct. App. 2014) (granting summary judgment to the national Sigma Chi fraternity for what it deemed to be an "unforeseeable" criminal assault of a party attendee by another guest); <u>Colangelo v. Tau Kappa Epsilon Fraternity</u>, 517 <u>N.W.</u>2d 289, 292 (Mich. Ct. App. 1994) (finding that "the national fraternity owed no duty to

supervise the local chapter's actions for the protection of third parties" for injuries arising from a drunk driving accident).

The main case that plaintiff relies on, <u>Delta Tau Delta v. Johnson</u>, 712 <u>N.E.</u>2d 968, 973-74 (Ind. 1999), is factually inapposite. In <u>Delta Tau Delta</u>, <u>supra</u>, the Indiana Supreme Court determined that the Delta Tau Delta ("DTD") fraternity owed a duty to a plaintiff who was sexually assaulted. Of particular importance for the Indiana Supreme Court's decision were several facts — none of which are present here — that the Court believed made the ultimate sexual assault foreseeable. Specifically, the Indiana justices noted that:

> Within two years of this case, two specific incidents occurred which warrant consideration. First, in March 1988, a student was assaulted by a fraternity member during an alcohol party at DTD. Second, in April 1989 at DTD, a blindfolded female was made, against her will, to drink alcohol until she was sick and was pulled up out of the chair and spanked when she refused to drink. In addition, the month before this sexual assault occurred, DTD was provided with information from National concerning rape and sexual assault on college campuses. Amongst other information, DTD was made aware that "1 in 4 college women have either been raped or suffered attempted rape," that "75% of male students and 55% of female students involved in date rape had been drinking or using drugs," that "the group most likely to commit gang rape on the college campus was the fraternity," and that fraternities at seven universities had

"recently experienced legal action taken against them for rape and/or sexual assault."

[Id. at 973-74.]

The record in this case is devoid of any such similarly alarming data or prior instances of criminal acts. Plaintiff offers no proof that the fraternity members should have been aware of the level of crime at or around the house, or that crime had risen in the area, or that there was a need for any, much less additional, security.

We therefore affirm the trial judge's grant of summary judgment in favor of defendants. In light of that disposition on the merits, we need not address the issues raised concerning the relationship of TKE national to TKE local and to the fraternity officers and members who leased the house. Nor do we need to address the cross-appeals of Tattoli and De Sousa concerning the statute of limitations, since the claims against them have been dismissed on the merits.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

27                                                          A-5419-12T4