# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1613-23

JANE DOE,

    Plaintiff-Appellant,

v.

ZETA PSI FRATERNITY, INC.,

    Defendant-Respondent,

and

DELTA CHAPTER OF ZETA PSI
FRATERNITY, ALUMNI
ASSOCIATION OF THE DELTA
CHAPTER OF ZETA PSI
FRATERNITY OF NORTH
AMERICA, INC.,

    Defendants.

_____

Submitted January 23, 2025 – Decided April 29, 2025

Before Judges Marczyk, Paganelli and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-6507-19.

Brian D. Kent (Laffey Bucci & Kent, LLP) and M. Stewart Ryan (Laffey Bucci & Kent, LLP), attorneys for appellant.

Zarwin, Baum, DeVito, Kaplan, Schaer & Toddy, PC, attorneys for respondent (Timothy P. Mullin, on the brief).

PER CURIAM

Plaintiff Jane Doe appeals from the trial court order of April 28, 2023, that granted defendant Zeta Psi Fraternity, Inc. (Zeta Psi) summary judgment and dismissed her complaint with prejudice. The April order granted reconsideration of a trial court order of March 2, 2023, that had denied Zeta Psi summary judgment.[1] Because there were no material facts in dispute and the trial court correctly applied the law, we affirm.

I.

Zeta Psi is an international men's fraternal organization. Delta was recognized by Zeta Psi and Rutgers University (Rutgers) as a local chapter of Zeta Psi on Rutgers's New Brunswick, New Jersey campus. The Alumni

---

[1] Defendant Delta Chapter of Zeta Psi Fraternity (Delta) was granted summary judgment in the March order. Plaintiff has not appealed that order. While the appeal was pending, plaintiff filed a stipulation of dismissal as to defendant Alumni Association of the Delta Chapter of Zeta Psi Fraternity of North America, Inc. (Alumni Association).

Association "is an independent self-governing entity." According to the Alumni Association's bylaws, its purpose, in part, is to "afford home, educational, social and recreative advantages to any students at Rutgers . . ., who may be members of the Delta Chapter." The Alumni Association owned a house in New Brunswick. The house served as a fraternity house for the Delta Chapter.

In February 2014, Frank DiLeo, on behalf of the Alumni Association, suspended Delta's charter. In the letter of suspension, DiLeo explained the suspension was necessary because all other "avenues available to change . . . behavior" of the members had not worked. Further, the letter advised that "[i]t ha[d] been made very clear that no social activities [we]re allowed at the house going forward and that [Delta] as an organization ha[d] ceased operations."

The suspension was imposed for five years. The goal was to "allow any initiated undergraduate to matriculate," and have Delta start anew with reinstatement in the Spring of 2019.

During the period of suspension, the Alumni Association leased the house to another fraternity for approximately one year, and entered into individual leases with other tenants who were members of other fraternities or who had no fraternity affiliation at all.

A-1613-23

In August 2016, Timothy Little, Secretary of the Board of Trustees to the Alumni Association, wrote a letter to Lauk Walton, Executive Director of Zeta Psi, following their telephone conference, to "formalize" the Alumni Association's request to accelerate Zeta Psi's "time line to recolonize . . . Delta." Little explained the Alumni Association "need[ed] to verify that [Zeta Psi] w[ould] consider reinstatement of [the] Charter." Little noted "[a]lcohol use in [the house could ]not be tolerated" and "request[ed] the ability to start up in January of 2017."

In November 2016, following a meeting between the Alumni Association and Zeta Psi, Little again wrote to Walton. The letter was an attempt to summarize their discussion and stated: Delta's suspension would remain until the Spring Semester of 2018; but as early as January 2017 and through 2017, the Alumni Association would be permitted to initiate associates. Little requested that Walton "confirm that the summary . . . [wa]s accurate and acceptable."

On December 6, 2016, Walton, in a group email, stated he had met with "junior staff" from Rutgers University Fraternity and Sorority Affairs (RUFSA) regarding a "petition to return to campus." He noted, as Delta "start[ed] down the path of this reactivation, it w[ould] be imperative that there are no risk management slip ups or . . . linkage back to the old group."

4

In addition, Walton stated he "would be reluctant to begin initiating any young men to be future actives without the express approval of Zeta Psi . . . th[at wa]s not an action [he] ha[d] the authority to approve."

In December 2016, Little again wrote a letter to Walton regarding Delta's reinstatement at Rutgers. The letter advised it was "critical to . . . [Delta's] reinstatement efforts that all efforts are made so that [Delta has] a fully functioning active chapter by 2018, and not delay to 2019." Therefore, with the "consent" of Zeta Psi, the Alumni Association was "initiating . . . candidates on January 10, 2017, and . . . additional [candidates] in May and the following December."

Further, Little advised that "the mandates set out in the Zeta Psi . . . Risk Management [policies] are being taught and are required to be followed precisely. We are committed to becoming a model chapter fully conforming to the platforms and standards of the future . . . including the mandate to be alcohol free."

In DiLeo's deposition, he testified that the January 10 initiation went forward. He stated that individuals "were initiated into Zeta Psi by the Alumni Association." Nonetheless, he stated, the initiation did not follow the "same process" or "rituals" that Zeta Psi would use. He noted there was no: (1)

documentation; (2) payment of dues; or (3) pin or book. He stated that neither he nor the Alumni Association ever initiated anyone in this "fashion" before. He stated that he did not notify Walton or Zeta Psi about the initiation afterwards.

In late January 2017, Zeta Psi held an executive committee meeting. The minutes of the meeting reflect that Delta's request "to initiate a small group of brothers in anticipation of their 'impending' reactivation" and to "adjust the rechartering date to Spring 2018," was denied.

Following the executive committee meeting, Walton emailed DiLeo and advised "the timeline for the re-activation of . . . Delta . . . remain[ed] unchanged with a target date of initiating new members and re-activating the chapter during the 2019 Spring Semester."

In February 2017, Bhavin Hirpara and Mena Silver executed separate leases with the Alumni Association. They picked each other as roommates. In his deposition, Silver testified that when he executed the lease, he was not a member of a fraternity and never became a member of a fraternity. He understood "in the past [the house was] a fraternity house and it was no longer one, and that[ wa]s why [he]was able to get a room in it."

A-1613-23

In Hirpara's deposition, he testified that because he "liv[ed] in the house with the rest of the members[ of Zeta Psi, he] was part of th[e] group." He stated he understood there were members of other fraternities, members of Zeta Psi, and non-fraternity members living in the house. Nonetheless, he thought he was a Zeta Psi brother because "previously, . . . all the brothers of the fraternity lived in that house. So if [he] lived there, [he] was a brother." He stated he did not participate in any "process [to] . . . bec[o]me initiated or associated with Zeta Psi." He stated he paid dues in the form of rent. Further, he testified he attended weekly or bi-weekly meetings to discuss "[w]hen [the] next big party should be" and "how [the] day was."

In Walton's deposition, he stated he met with Rutgers in May 2017. Our review of Walton's deposition transcript reveals the following:

> Q. It's your testimony that Rutgers . . . asked [Zeta Psi] to ensure that residents of [the house] were following Zeta P[si] Risk Management procedures?
>
> A. No, no, not at all.
>
> Q. So when you say the college, . . . [Rutgers] asked you to, what do you mean by that? What did they ask you to do?
>
> A. They asked us to make sure that the [house] was safe.
>
> Q. When did they do that?

7

A-1613-23

A.  Again, likely in the May meeting . . ., it's a very standard [Rutgers's] request.

. . . .

Q.  And did you undertake that duty . . . at the request of . . . [Rutgers] to ensure that the [house] was safe?

. . . .

A.  So – yeah, no.  We did not accept the duty to do that.

Q.  Okay, so let me get this straight.  You're saying that . . . [Rutgers] asked you, meaning [Zeta Psi], to keep [the house] safe.  That's what you just said, right?

A.  Yes.

Q.  Did you do that?

A.  We advised the Alumni [Association] to do that.

Zeta Psi and the Alumni Association met in May 2017.  The notes of the meeting state:  (1) "[t]he current perception of the [house wa]s that it [wa]s seen, as still being a 'party place'"; (2) "Zeta Psi hope[d] to return [to] Rutgers in the 2018-19 academic year"; and (3) RUFSA "expect[ed] that recruitment of new members [would] occur[] in the same year that the fraternity applie[d] for reinstatement."

On August 30, 2017, JoAnn Arnholt, Executive Director of RUFSA, received an email that reported the house was "up to no good once again."  The

8                                                                          A-1613-23

email stated that "[s]ince Zeta Psi . . . ha[d] been eligible to return, they have been operating and recruiting illegally." The email stated "[u]nderground fraternities and their parties at [the house] must be stopped." Arnholt shared the email with Tyler Boisvert, Associate Executive Director to Zeta Psi, and requested that he "do a little digging to check on" the allegations.

In response, Boisvert stated he recognized the "serious allegations." He stated Zeta Psi "ha[d] been working to ensure that the future of . . . Delta . . . ha[d] nothing to do with social standing." He indicated he would "get to the bottom of it."

On September 19, 2017, Boisvert emailed Arnholt and noted that he interviewed key members of the Alumni Association. He stated he was "working with [Walton] to do a training session with the entire [Alumni Association] in the next 6 months as [he] still ha[d] some concerns."

In a letter of the same date, from Boisvert to Arnholt, he wrote that "Zeta Psi held meetings with the [Alumni] Association . . . to discuss . . . allegations includ[ing] surreptitious recruiting and having social events with undergraduate members for the purpose of recruitment." He noted that the Alumni Association's leases did not permit "any type of social function or alcohol in the house without the written consent of property manager . . . DiLeo." Further, he

stated DiLeo "learned about the Zeta Psi Risk Management procedures as well as learning more about . . . sound risk management policies and practices." He noted DiLeo "state[d] that current residents are required to have an approved guest list, follow BYOB or [third] party vendor alcohol distribution and have sober door duty monitors before ever being allowed to hold an event."

Further, Boisvert stated that "Zeta Psi [wa]s planning on working with the [Alumni Association] to further state that the students need to make sure the events, when allowed, would follow these Risk Management [p]olicies."

In Walton's deposition testimony he explained:

Q. Okay. So you advised the Alumni Association to keep the [house] . . . safe, because that's what . . . [Rutgers] requested; is that what you're saying?

A. Yes.

Q. Okay. In this portion of this letter it says, Zeta P[si] is planning on working with the [Alumni Association] to make sure that the residents are following the Risk Management policies. Was that because . . . [Rutgers] had asked [Zeta Psi] to keep the [house] safe?

A. Yeah, partially. The other piece is the other groups have similar Risk Management policies that apply to their activities, so it all made sense.

Q. So what did [Zeta Psi] do to ensure that the residents of [the house] were following the Zeta P[si] Risk Management policies after . . . [Rutgers] asked you to keep the [house] safe?

. . . .

[A.] We worked with the Alumni Association to let them know . . . [Rutgers]'s concerns and to reiterate safe practices.

Q. And that was being done as of the date of the authoring of this letter?

A. Yes. I think so.

Q. Do you think so or you know so because it says it in a letter?

A. The timing is unknown to me. But, yes, this letter, this letter -- you know, certainly we are having conversations with . . . [Rutgers] and with the Alumni Association, so sure.

Q. About keeping the [house] safe by following the Zeta Psi Risk Management policies, right?

A. Again, I would link it that we want them to be safe.

Q. And the letter said that you're going to keep it safe by following the Zeta P[si R]isk [M]anagement polic[ies]. That's what the letter says, right?

A. Yes.

Q. And that's what you were doing, right?

A. Yes.

In his deposition, DiLeo testified that he, as president of the Alumni Association, managed the house. He also testified that he and the Association's

11

board developed the rules attached to the lease. DiLeo and Little, in their depositions, both testified that Zeta Psi had no "management responsibilities" or "oversight" of the house.

In her statement to Rutgers's investigators, plaintiff noted that on September 21, 2017, she and a group of friends attended parties that evening. Further, she stated the group went to the house between midnight and 1:00 a.m. Plaintiff acknowledged that she drank alcohol at the parties and continued to drink at the house. She stated that she and Silver went to Silver's and Hirpara's room around 2:00 a.m. Silver let plaintiff sleep in his bed. Plaintiff described that she "passed out" because she was "sleepy" and from the alcohol.

Plaintiff stated that later someone climbed into the bed with her; she thought it was Silver, but it was Hirpara. She "did not recall anything else that happened until" her friend entered the room and yelled for them to put their clothes on. Plaintiff alleged Hirpara sexually assaulted her.

Plaintiff filed a seven-count complaint against Zeta Psi, Delta, and the Alumni Association claiming, among other things, they were negligent and responsible for the sexual assault.

After the completion of discovery, defendants filed motions for summary judgment. On March 2, 2023, after hearing the parties' oral arguments, the trial

court granted Delta's motion, but denied Zeta Psi's and the Alumni Association's motions.[2] In an oral opinion, the court granted Delta's motion because it was "uncontroverted," and there was "no issue of fact" that "there was no . . . Delta," it "did[ not] even exist," and therefore it did not "owe a duty to anybody going to that house."

As to Zeta Psi, the trial court denied the motion for summary judgment because Zeta Psi "quelled the outcry to . . . [Rutgers] about what was going on at [the house] and made it easier for the Alumni Association to continue on with their mission." The court found Zeta Psi "interjected on behalf of the Alumni Association telling . . . Arnholt . . . [not to] worry . . . we[ are] going to make sure they follow our rules." Further, the court determined that it was "entirely foreseeable that . . . a sexual assault . . . [would occur in] this house."

In addition, the trial court denied the Alumni Association's motion for summary judgment because there was a "powerful case . . . against the [Alumni] Association." The court found the Alumni Association had "control" of the house. The trial court stated the Alumni Association "set[] the rules" and "had

---

[2] The trial court also dismissed five counts of plaintiff's complaint, and plaintiff voluntarily dismissed another count. Only the negligence claim remained against Zeta Psi and the Alumni Association.

. . . control of how they were going to enforce those rules, which clearly, they did[ not] do."

The Alumni Association and Zeta Psi filed motions for reconsideration of the March orders. On April 28, 2023, after hearing the parties' oral arguments, the trial court, in an oral opinion, denied the Alumni Association's motion for reconsideration and summary judgment. The court stated, "the party that clearly [wa]s liable here [wa]s the Alumni Association."

However, the trial court granted Zeta Psi's motion for reconsideration and dismissed plaintiff's complaint, as to it, with prejudice. The court stated the occurrence was "foreseeable"[3] and "Zeta Psi certainly d[id not] have clean hands," but granted summary judgment because Zeta Psi "had no control over the[ house]" and "there[ was] nothing they could have done." The court noted Zeta Psi "could tell [the Association] what to do and . . . tell them how to [comport] themselves, but they could[ not] force [the Association] to do" anything.

---

[3] The trial court stated the sexual assault was "certainly . . . foreseeable" citing to our opinion in Peguero v. Tau Kappa Epsilon Local Chapter, 439 N.J. Super. 77, 93 (App. Div. 2015), where we noted our "cognizan[ce] of the tragic consequences of hazing, excessive drinking, sexual assaults, and other harmful acts that have occurred at fraternity houses or at other fraternity events."

14

On appeal, plaintiff contends the trial court erred because there was a dispute of material fact concerning: Zeta Psi's control of the house; the Alumni Association being an agent of Zeta Psi; and Zeta Psi's assumption of a duty to protect students and Jane Doe from sexual assault.

We review the grant of summary judgment de novo, applying the same legal standards as the trial court. Green v. Monmouth Univ., 237 N.J. 516, 529 (2019).

> The judgment or order sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.
>
> [R. 4:46-2(c).]

"The factual findings of a trial court are reviewed with substantial deference on appeal, and are not overturned if they are supported by 'adequate, substantial and credible evidence.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014) (quoting Pheasant Bridge Corp. v. Twp. of Warren, 169 NJ. 282, 293 (2001)).

"If there is no genuine issue of material fact, we must then 'decide whether the trial court correctly interpreted the law.'"  DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div 2007), overruled on other grounds by Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 563 (2012)).  We review issues of law de novo and accord no deference to the trial judge's conclusions of law.  Nicholas v. Mynster, 213 N.J. 463, 478 (2013).  "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."  Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

## A.

"To prevail on a claim of negligence, a plaintiff must establish four elements:  (1) that the defendant owed a duty of care; (2) that the defendant breached that duty; (3) actual and proximate causation; and (4) damages."  Fernandes v. DAR Dev. Corp., Inc., 222 N.J. 390, 403-04 (2015).  "Premises liability is a subset of general negligence law" and requires a plaintiff to establish the same elements.  Peguero, 439 N.J. Super. at 88. "The determination of [whether a duty exists] is generally considered 'a matter of law properly

decided by the court.'" Carvalho v. Toll Bros. & Devs., 143 N.J 565, 572 (1996) (quoting Wang v. Allstate Ins. Co., 125 N.J. 2, 15 (1991)). Therefore, our analysis is de novo. See Nicholas, 213 N.J. at 478.

The New Jesey Supreme Court has considered the existence of a duty, in premises liability litigation, under two tests. See Shields v. Ramslee Motors, 240 N.J. 479, 493 (2020). The first test examines control of the property. The Shields Court cited the Restatement (Second) of Torts § 360 (Am. L. Inst. 1965), for the proposition that "[a] possessor of land who leases a part thereof and retains in his own control any other part which the lessee is entitled to use as appurtenant to the part leased to him, is subject to liability to his lessee and others lawfully upon the land." Id. at 491-92 (alteration in original).

The Court in Shields also considered a second test, that it had expounded in Hopkins v. Fox and Lazo Realtors, 132 N.J. 426, 439 (1993). Shields, 240 N.J. at 492. In Hopkins, the Court considered "[w]hether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy." 132 N.J. at 439. The Court stated the "fact-specific and principled" "inquiry involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk,

17

the opportunity and ability to exercise care, and the public interest in the proposed solution." Ibid.

In Shields, the Court applied the control and Hopkins factor tests and "reach[ed] the same result." Shields, 240 N.J. at 493. We undertake the same analysis here, and conclude that under either test, Zeta Psi owed no duty to plaintiff.

In considering control of the house, we note that Zeta Psi had no ownership or possessory interest in the house. Further, the Alumni Association admits that it managed the house and Zeta Psi had no "management responsibilities" or "oversight" of the house. Under these circumstances, it cannot be disputed that Zeta Psi had no control over the house. Therefore, under the control test, no duty would be imposed on Zeta Psi.

Under the Hopkins factor test, Zeta Psi had no relationship with the Alumni Association's tenants, Hirpara, or Jane Doe. The Alumni Association— not Zeta Psi—and the tenants entered into leases in the house. Thus, Zeta Psi and the tenants had no relationship.

The Alumni Association's makeshift initiation could not give rise to a relationship between those purported initiates or tenants and Zeta Psi, because Zeta Psi did not give consent to the initiation and, in fact, declined permission

to conduct the initiation. Further, there was no documentation, dues paid, pins, or books that could support that a relationship between those initiates, or tenants, and Zeta Psi was created as a result of the initiation. Therefore, the unauthorized initiation did not create a relationship between Zeta Psi and those initiates or tenants.

Furthermore, Zeta Psi had no relationship with Hirpara. Hirpara's reasoning that he became a member of Zeta Psi, without an initiation or process, merely because he moved into the Alumni Association's house and attended meetings to discuss the next party or how someone's day went, does not support a relationship between Zeta Psi and Hirpara.

Lastly, there is no evidence of a relationship between Zeta Psi and plaintiff. We have considered plaintiff's assertion that she was at the house for a party "subsequent to a rush event for Zeta Psi." To support this assertion, plaintiff relies on the deposition testimony of a friend that she was with on the night of the alleged assault. The friend testified it was her "impression" that plaintiff and others arrived at the house after a "pledge party." She thought her impression made sense because people were drinking "beer" and hanging out in the basement of the house.

A-1613-23

Zeta Psi counters that "[p]laintiff's characterization of the alleged incident occurring at a Zeta Psi sponsored party . . . [wa]s completely without any factual basis." Zeta Psi relies on Silver's deposition testimony that there had not been any parties on the night of the alleged assault. Instead, Silver described there was "a group of people drinking" but "definitely not a party." He stated a party was something different and this night was a "usual[] . . . happening."

Even giving plaintiff every inference on these facts, they fail to muster a dispute of fact concerning a relationship between plaintiff and Zeta Psi. Indeed, even inferring a rush party took place, there is no evidence Zeta Psi was aware of the event. Therefore, the first Hopkins factor does not weigh in favor of imposing a duty.

The risk "aspect of the inquiry focuses the [c]ourt on the issue of whether the risk is foreseeable, whether it can be readily defined, and whether it is fair to place the burden of preventing the harm upon the defendant." Shields, 240 N.J. at 493 (quoting Davis v. Devereux Found., 209 N.J. 269, 296 (2012)). Considering the nature of the risk, we recognize, as did the trial court, the tragic events "that have occurred at fraternity houses or at other fraternity events." Peguero, 439 N.J. Super. at 93. However, here the sexual assault did not occur at a Zeta Psi fraternity house. Instead, the alleged assault occurred at the Alumni

Association's house, arguably after an Alumni Association event, and without notice to Zeta Psi. Under these circumstances, it would not be fair to impose a duty on Zeta Psi. Therefore, the second Hopkins factor does not weigh in favor of imposing a duty.

The analysis of Zeta Psi's "'opportunity and ability to exercise care' . . . is similar to . . . [the] analysis of control." Shields, 240 N.J. at 493. Again, we note that Zeta Psi had no control over the Alumni Association's house. Therefore, the third Hopkins factor does not weigh in favor of imposing a duty on Zeta Psi.

Lastly, on the facts presented here, imposing a duty on Zeta Psi would not serve any public interest. Certainly, we are sympathetic to a victim of sexual assault. However, as the Court noted in Shields, plaintiff is not "left without redress; [s]he can recover" against others. Id. at 494.

B.

Plaintiff contends that "Zeta Psi, the Alumni Association, and the Delta Chapter, maintained an agency relationship through all relevant time periods." She argues that "the Alumni Association requested, . . . approval to restart charter operations," and there were meetings where the Alumni Association "discussed their plans to initiate members." She asserts that Zeta Psi could have

21

"'put a stop' to the underground recruiting and social hosting of the Delta Chapter."

"An agency relationship is created 'when one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" N.J. Lawyers' Fund for Client Prot. v. Stewart Title Guar. Co., 203 N.J. 208, 220 (2010) (quoting Restatement (Third) of Agency § 1.01 (Am. L. Inst. 2006)).

Plaintiff's argument, that an agency relationship existed between Zeta Psi and the Alumni Association, fails because the Alumni Association's stated desire to "restart charter operations" and "initiate members," in letters or at meetings, does not evidence an agreement between Zeta Psi and the Alumni Association to enter into an agency relationship.

In fact, Zeta Psi rebuffed the Alumni Association's desire to begin initiations in anticipation of reactivation and denied the Alumni Association's request to effectuate recharter earlier. Under these circumstances, there is no factual support for plaintiff's argument that Zeta Psi and the Alumni Association had an agency relationship.

C.

Plaintiff contends that Zeta Psi "assumed a duty to keep [the house] safe." She asserts that Zeta Psi "promised Rutgers they would" "keep the [house] safe" and "[t]here [wa]s . . . a genuine issue of material fact regarding whether Zeta Psi assumed the duty to protect against sexual assault and other foreseeable harms occurring at" the house.

In Fackelman v. Lac d'Amiante du Quebec, we noted the:

> Restatement (Second) of Torts § 324A (Am. L. Inst. 1965) governs liability of third parties for negligent performance of an undertaking; it provides:
>
>> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person . . . is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>>
>> (a) his failure to exercise reasonable care increases the risk of such harm, or
>>
>> (b) he has undertaken to perform a duty owed by the other to the third person, or
>>
>> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

[398 N.J. Super. 474, 481 (App. Div. 2008) (quoting
Restatement (Second) of Torts § 324A (Am. L. Inst.
1965)) (citation reformatted).]

Zeta Psi contends the "duty to foresee and prevent a particular harm is essential to the finding of liability under this theory" and "there are simply no facts that show that Zeta Psi . . . had any notice of . . . Hirpara's alleged propensity to commit a criminal act" and it "responded to Rutgers['s] direct request to 'dig into' rumors surrounding [the house] and informed Rutgers that it planned on working with the Alumni Association to have residents of the [house] follow Zeta Psi['s] . . . Risk Management [p]olicies."

Zeta Psi further argues that "informing Rutgers that Zeta Psi . . . was planning on advising the Alumni Association of [R]isk [M]anagement policies d[id] not equate to a duty to foresee and prevent the actions of . . . Hirpara from materializing."

Zeta Psi's response raises a few issues. First, as we stated, the trial court found the alleged sexual assault was "certainly foreseeable." Given our opinion in Peguero, and our standard of review, we have no reason to disturb that finding.

Second, the New Jersey Supreme Court has recognized that landlords and landowners have "a duty to take reasonable security precautions to protect

tenants and their guests" and "customers," "from foreseeable criminal acts." Gonzalez v. Safe & Sound Sec. Corp., 185 N.J. 100, 121 (2005). Therefore, "[w]hen [they] know[] or should know of a pattern of criminal activity on his [or her] premises that poses a foreseeable risk of harm . . . and do[] not take reasonable steps to meet the danger, he [or she] cannot escape liability merely because the criminal act was committed by a third party who was not within his [or her] control." Ibid. Therefore, construing the Restatement and Gonzalez together, Zeta Psi could face liability if it assumed the Alumni Association's duty to protect plaintiff.

Plaintiff contends "that Zeta Psi promised Rutgers, more than once, that it would provide appropriate oversight of the Alumni Association." To establish that Zeta Psi assumed a duty, plaintiff asserts: (1) "in May 2017, [Walton] stated [Zeta Psi] would ensure safety o[f] the [house] by enforcing [its] Risk Management policies . . . [and] claimed to be doing just that"; (2) "Walton . . . admitted that he promised Rutgers . . . that Zeta Psi would work to keep the [house] safe through the . . . Risk Management policies"; (3) "in Boisvert's September 201[7], letter, he describe[d] in detail the training provided to DiLeo on [the] Risk Management policies and assure[d] continued monitoring" and "identifie[d] certain safeguards put in place and allegedly being followed by

those living" in the house; and (4) Boisvert went "so far as to inform Rutgers of DiLeo's recent training, of the [r]ules contained in the [l]ease for rooms [in the house], and of the additional measures being taken to ensure other aspects of the . . . Risk Management policies beyond the [l]ease [r]ules were in place."

Against these assertions, we note Walton denied that Zeta Psi ensured the Alumni Association was following the Risk Management policies or accepted the duty to make the house safe. Instead, Walton testified, Zeta Psi advised the Alumni Association to keep the house safe and was working with the Alumni Association to make sure its residents were following the Risk Management policies.

Further, in Boisvert's letter to Arnholt he noted: (1) the Alumni Association's leases required DiLeo's consent before allowing any social event or alcohol in the house; (2) DiLeo learned about Zeta Psi's Risk Management policies and other risk management policies and practices; (3) and DiLeo's statement regarding bringing alcohol into the house and "sober [door] duty monitors." Boisvert also stated Zeta Psi was "planning on working with the [Alumni Association]" further.

Even giving plaintiff every inference, Walton's and Boisvert's statements do not raise an issue of dispute regarding whether Zeta Psi assumed a duty to

26

ensure the house was safe or to ensure that the Alumni Association was complying with Zeta Psi's Risk Management policies, or even the Alumni Association's own lease. Instead, the evidence discloses Zeta Psi took efforts to assist the Alumni Association to make the Alumni Association's house safe.

This conclusion is further buttressed by the Alumni Association, through statements from DiLeo and Little. DiLeo testified that he, as president of the Alumni Association, managed the house. Further, DiLeo and Little both testified that Zeta Psi had no "management responsibilities" or "oversight" of the house.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1613-23